FIFTH DIVISION

No. 1-07-0266

THE PEOPLE OF THE STATE OF ILLINOIS,    )        Appeal from the
        )        Circuit Court of
        Plaintiff-Appellee,    )        Cook County, Illinois.
        )
        )        No. 04 CR 13669 (05)
v.        )
        )
LAQUITA CALHOUN,        )        Honorable
        )        Stanley J. Sacks,
        Defendant-Appellant.    )        Judge Presiding.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County defendant, Laquita Calhoun, was found guilty of kidnaping and first degree murder, and sentenced to 7 years' imprisonment for kidnaping and 60 years' imprisonment for murder, with the sentences to be served consecutively. On appeal, defendant first contends that the circuit court erred in failing to provide separate verdict forms for each theory of first degree murder (intentional, knowing or felony murder), or in the alternative, that she was denied effective assistance of counsel when her attorney failed to request such separate verdict forms. Defendant contends that if the conviction was in fact for felony murder, the underlying felony (kidnaping) would be a lesser included offense of murder and would have precluded the trial court from imposing a separate sentence on the underlying kidnaping. Secondly, defendant contends that the trial judge abused his discretion in sentencing her because he did not adequately consider the relevant mitigating factor of provocation in that when she committed the crime she believed that the adult victim had molested her one-year-old daughter. Instead, the judge sentenced defendant to the

1

maximum time permitted for first degree murder for acting as a vigilante to retaliate for the rape of her daughter, noting the brutal manner by which her revenge was carried out. Lastly, defendant contends, and the State concedes, that the mittimus must be corrected to reflect that defendant was convicted of one count of first degree murder and one count of kidnaping, rather than two counts of first degree murder (one being a conviction for intentional or knowing murder and the other a conviction for felony murder). For the reasons discussed below, we affirm in part and reverse and remand in part, and order the mittimus corrected.

## I. BACKGROUND

The following facts are undisputed. On February 28, 2004, the 29-year-old victim, Alonzo Jones, was present in codefendant Jeanette Daniels' apartment at 7425 South Parnell, when he was accused by defendant of molesting her child. As a result of this accusation, Alonzo was attacked and beaten by defendant and codefendants Terrance Jones (hereinafter Terrance) and Katherine Calhoun (hereinafter Katherine), in the presence of Derrick Fleming (hereinafter Derrick), Lakesha Collins (hereinafter Lakesha) and Jeanette Daniels (hereinafter Jeanette). Alonzo was then dragged outside and placed in the trunk of Derrick Fleming's car. On the following morning, his body was found in an alley near 5630 South Michigan Avenue.

On April 13, 2004, after learning that there was a warrant for her arrest, defendant turned herself in, confessed to her participation in the crime, and gave a videotaped statement to police. Soon thereafter, defendant, together with five codefendants, was indicted on 28 charges including: (1) eleven counts of first degree murder (720 ILCS 5/9-1(a)(1) through (a)(3) (West 2002)); (2) four counts of aggravated kidnaping (720 ILCS 5/10-2(a)(3) (West 2002)); (3) four

2

counts of aggravated criminal sexual assault (720 ILCS 5/12-14 (a)(1), (a)(2), (a)(4) (West 2002)); (4) one count of criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2002)); (5) two counts of kidnaping (720 ILCS 5/10-1(a)(1), (a)(2) (West 2002)); (6) one count of possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2002)); (7) one count of burglary (720 ILCS 5/19-1(a) (West 2002)); and (8) five charges of aggravated battery (720 ILCS 5/12-4(a), (b)(8) (West 2002)).

Codefendants Lakesha, Terrance, Katherine, Jeanette and Navon Foster (hereinafter Navon) were all charged with first degree murder (720 ILCS 5/9-1(a)(1) through (a)(3) (West 2002)); aggravated kidnaping (720 ILCS 5/10-2(a)(3) (West 2002)); kidnaping (720 ILCS 5/10-1(a)(1), (a)(2) (West 2002)) and aggravated battery (720 ILCS 5/12-4(a), (b)(8) (West 2002)). Terrance was also charged with aggravated criminal sexual assault (720 ILCS 5/12-14 (a)(1), (a)(2), (a)(4) (West 2002)). Navon was also charged with possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2002)) and burglary (720 ILCS 5/19-1(a) (West 2002)). Prior to defendant's trial in this case, Terrance proceeded with a bench trial and was found guilty of first degree murder and attempted aggravated criminal sexual assault, and was sentenced to consecutive terms of 28 years' and 7 years' imprisonment, respectively. Similarly, prior to defendant's trial, codefendants Lakesha and Katherine each pleaded guilty to murder in exchange for a 20-year sentence. Codefendant Jeanette was tried simultaneously with defendant, but in a bench, rather than a jury trial. She was found guilty of aggravated kidnaping and sentenced to 14 years' imprisonment.[1] Codefendants Lakesha, Katherine, and Derrick all

---

[1] That conviction was reversed and the cause was remanded for a new trial on the basis of

testified at defendant's trial on behalf of the State. Defendant and each of the codefendants were sentenced by the same judge.

### A. Jury Trial

On October 11, 2006, defendant proceeded with a jury trial. As already noted above, defendant's jury trial was conducted simultaneously with codefendant Jeanette's bench trial. The transcript of the trial proceedings reveals the following pertinent evidence.

### 1. State's Case in Chief

As part of its case in chief, the State presented defendant's videotaped statement to the jury. In that videotaped statement, defendant told police that at the time of the incident she was 23 years old and that she had five children, ages: seven, six, four, two and one. Navon was the father of the four older children and Derrell Short (hereinafter Derrell) was the father of the youngest girl, Denise, who was one year old at the time.

According to defendant's videotaped statement, on the evening of February 28, 2004, she was bathing her youngest daughter Denise, when she noticed that the girl's "private part was open." Defendant explained that her daughter's vagina appeared to be abnormally large, as if it had been stretched. Because earlier that day her next-door neighbor, Jeanette, had babysat for Denise, defendant immediately went to Jeanette's house to find out what had occurred.

Defendant told police that when she arrived at Jeanette's house, Jeanette, defendant's sister Katherine, Lakesha, and Alonzo were there. Defendant asked Alonzo whether he had "done something to her baby" and Alonzo responded that he did not "want to say it in front of

_____

the trial court's erroneous admission of Jeanette's videotaped confession into evidence.

4

the others." Alonzo then told defendant privately that he "did it." Defendant was upset and informed everyone in the apartment. At that point Jeanette stated that Alonzo had "done that to [her] baby too." Defendant asked Jeanette why she continued to allow Alonzo to live in her house if he "did that" to her children, and then she fell to her knees and started crying.

According to defendant's videotaped confession, at that point, Terrance walked into the apartment and asked her "what was wrong." Defendant told him that Alonzo had hurt her child. Terrance then struck Alonzo with a broomstick and attempted to stick the broom in Alonzo's anus. Defendant told the police that while Terrance was attacking Alonzo, she unsuccessfully attempted to telephone Denise's father, Derrell. As defendant proceeded to the bathroom, Alonzo ran out of the apartment to the first-floor landing and out the back door. Defendant ran after him and pulled him back up the stairs to Jeanette's apartment. After defendant returned to the apartment with Alonzo, Lakesha suggested that they put Alonzo in the trunk of Lakesha's boyfriend's car and take him to Denise's father, Derrell. Defendant, together with LaKesha, Katherine and Jeanette, then dragged the screaming Alonzo to the car, put him inside the trunk and drove to 59th Street and Halsted to find Derrell.

According to defendant's videotaped statement, as they were driving, Lakesha asked defendant to stop at a liquor store at 59th Street and State Street. Once there, Lakesha opened the car trunk and called over to a few men standing on the corner. Lakesha told the men what Alonzo had done. They approached the car and kicked Alonzo several times. After this, Lakesha took over driving the car and defendant sat in the front passenger seat. Defendant could hear Alonzo moaning in the back.

Defendant next told police that at this point, one of the tires on their car went flat and they stopped at a gas station to fix it. Defendant stated that at this point she began imagining her "baby crying, [Alonzo] was hurting her and he didn't care," and she became angry. Defendant got out of the car and saw a broken bottle; she picked it up, and while Lakesha opened the trunk for her, she cut Alonzo, twice on his arm and once on his face. Defendant shut the trunk and got back into the car.

According to defendant's videotaped statement, the women could not find Derrell at home and therefore continued to the home of defendant's aunt, where Lakesha fell asleep while defendant telephoned Navon, the father of her other children. Defendant, together with Katherine and Jeanette, then proceeded to 74th Street and Parnell Avenue, where they picked up Navon. Defendant told Navon that Alonzo had "hurt her baby" and that she did not want him to "put his hands on [Alonzo]" but that she just "wanted to beat his butt." Navon agreed to help, and after dropping Katherine and Jeanette at their homes, he and defendant proceeded to a tire repair shop at 60th Street and State Street. Defendant told police that while the tire was being repaired, Alonzo asked twice to be let out of the trunk, but none of the mechanics heard him.

According to defendant's videotaped statement, after the tire was fixed, she and Navon drove to an alley at 56th Street and Michigan Avenue. Defendant opened the trunk and told Alonzo to get out. Defendant took a stick from the alley and hit defendant about 10 times on his back and head. Alonzo fell to the ground and defendant continued to beat him. After a few minutes, she stopped and entered the car. According to defendant, at that point, Navon, who was in the driver's seat, was preparing to drive away when he accidentally put the car in the wrong

gear and "backed up" over Alonzo's body. Defendant told police that as they drove away, she saw Alonzo crawling toward the middle of the alley, so Navon circled around the block and drove back into the alley and ran him over again. Defendant told police that she and Navon then drove back to Jeanette's apartment, where she called her aunt and told her what happened. Soon thereafter, defendant turned herself to police and confessed to her involvement in the crime.

The State next presented the testimony of three eyewitnesses, Derrick, Lakesha, and Katherine, who corroborated defendant's videotaped confession. First, Derrick testified that on the evening of February 28, 2004, he was inside Jeanette's apartment with his girlfriend Lakesha, Jeanette, defendant, defendant's sister Katherine, and Terrance, when he witnessed the attack on Alonzo. Derrick had never met Alonzo before, but testified that Alonzo appeared to be mentally challenged because he slurred his words. Derrick stated that the attack began after defendant, Lakesha and Katherine questioned Alonzo about defendant's baby, "whether he molested or touched her."

Derrick averred that even though Alonzo denied the allegations, Terrance walked over to him and kicked him in the testicles, and then struck him with a metal broomstick. Defendant followed and hit Alonzo twice with her fists before walking to the back room. According to Derrick, at that point, Lakesha opened the front door and told Alonzo to run. Alonzo attempted to escape, but Terrance called to defendant, telling her that Alonzo was "trying to get away." According to Derrick, defendant ran to the front, grabbed Alonzo by the neck, brought him back inside and threw him down onto the floor.

Derrick stated that, at this point, he, Lakesha and Lakesha' seven-year-old son left the

7

house to go to Lakesha's apartment. Once at Lakesha's apartment, Lakesha told Derrick to stay

with her son while she returned to defendant's house to "calm everything down." Derrick

testified that he next saw Lakesha on the following afternoon, at 4 p.m., that she was crying and

that she told him that "the boy was dead."

Derrick observed that his car had blood on the inside and outside of the trunk, as well as

on the antifreeze bottle. Derrick testified that he panicked and took the car to a car wash where

he washed off the blood and threw everything from the trunk into a nearby trash can.

Derrick further testified that soon after this incident, he spoke to police, told them what

he had witnessed at defendant's house, and led them to the trash can and the car wash where he

had attempted to clean out his car. Derrick averred that soon afterwards he spoke to the State's

Attorney and gave a handwritten statement.

On cross-examination Derrick testified that when he first observed Alonzo walking into

the living room, Alonzo had blood running down both of his wrists, which had been cut.

On cross-examination, Derrick was questioned about his testimony before the grand jury,

in which he admitted that when he left the apartment with Lakesha, he did not call the police or

anyone else for help because he thought "they were going to take [Alonzo] to the police station"

because they were "talking about taking him [there] and having him *** locked up." However,

Derrick testified that he could not recall making these statements before the grand jury.

Lakesha[2] next testified consistent with Derrick's testimony with respect to what

_____

[2]As already noted above, prior to defendant's trial Lakesha pleaded guilty to her

involvement in the murder of Alonzo, and at the time of her trial testimony, she was serving a

transpired in Jeanette Daniels' apartment. She further added that after dropping Derrick and her son at home, she returned to Jeanette's apartment in Derrick's car in order to "take [Alonzo] to the police station and turn him over to the police."

When questioned about the specifics of the crime, Lakesha averred that she could not recall what occurred that night. Although she admitted that she gave police a videotaped statement shortly after the crime, and acknowledged the answers that she then gave to police, she testified that those answers were coached and that she had given them because the police threatened to "lock her up," place her son in foster care, "and bounce him from home to home," as well as "put her boyfriend [Derrick Fleming] away for murder for a long time."

Because of Lakesha's recantations, her videotaped statement was introduced at defendant's trial. In that videotaped statement, Lakesha stated that on February 28, 2004, she was at Jeanette's home with defendant, Terrance, Derrick, Jeanette, and defendant's sister Katherine when defendant "accused Alonzo of molesting her baby." According to Lakesha's videotaped statement, Terrance then asked Alonzo if he was "doing that stuff to [the] kid they say he was doing," and that if it was true he would "do it to him [Alonzo]." Even though Alonzo denied having molested the baby, Terrance started beating Alonzo's legs and arms with a broom, and defendant kicked Alonzo in the face. Terrance also tried to sodomize Alonzo with the broomstick handle, asking him "why he was messing with kids and do [*sic*] he want him to show him how it feels [*sic*]." According to Lakesha's videotaped statement, at this point, Jeanette, who was sitting on the bed responded, "He [Alonzo] did it because he did it [*sic*] before to one

_____

20-year sentence.

9

of my babies."

In her videotaped confession, Lakesha further stated that soon thereafter defendant and Terrance went to the back of the apartment, and she opened the door for Alonzo to escape. Alonzo managed to get downstairs and reach the gangway before he was stopped by defendant and Terrance, who pushed him back upstairs.

Lakesha stated that she then left the apartment with her boyfriend, Derrick, and her seven-year-old son. Lakesha drove Derrick and her son home, but then proceeded to drive around the neighborhood looking for defendant's "baby daddy Derrell." Lakesha found Derrell and told him that "someone was fumbling his baby," but Derrell refused to go with her to Jeanette's apartment.

When Lakesha returned to the apartment, defendant, Jeanette, Katherine and Terrance were upstairs in the hallway outside the apartment. Lakesha told defendant that Derrell was not coming, so they had to "take Alonzo somewhere else, and somebody else would have to do it." According to Lakesha's videotaped statement, "to get down the stairs, everyone had a piece of Alonzo's body." Specifically, Lakesha told the police that she, defendant and Jeanette held Alonzo's arms, while Katherine and Terrance helped with Alonzo's legs. Lakesha popped the trunk open, and they put Alonzo in the trunk and closed it. Everyone got into the car, and the plan was to kill Alonzo and throw his body into the lake. They drove around for awhile until they stopped at a liquor store, and then defendant's aunt's house. Lakesha stayed at this house because she fell asleep. The next day, she heard Alonzo had been killed.

Defendant's sister Katherine also testified on behalf of the State.[3] Katherine initially refused to answer any of the prosecutor's questions on direct examination. In spite of the trial court's repeated admonitions, Katherine continued to be uncooperative and was found in contempt of court. Katherine was recalled later in the trial proceedings and questioned regarding her prior videotaped statement to police. Katherine ultimately admitted that she was in Jeanette's apartment at the time in issue but refused to give details about defendant's involvement in the crime.

Katherine admitted that she gave a videotaped statement to police on March 2, 2004, but stated that she did so only because the police told her that if she made a statement she would be allowed to leave. Katherine averred that many of the statements she made in that videotaped statement were not true and that she made them because she was "scared" and the police "made her say those things" by "yelling at her."

For example, on cross-examination, Katherine averred that there was never a plan to kill Alonzo or throw him in Lake Michigan and that she made that statement during her videotaped confession because the police "made her do it." Katherine further denied having told the police that: (1) while Alonzo was being dragged down the stairs into the trunk, she heard defendant telling Alonzo "you're going to die"; and (2) that on the following morning, defendant told her that she "cut the victim" and that Navon "rolled over" him four times.

Because Katherine's testimony was inconsistent with her earlier statements to police, her

_____

[3]At the time of her trial testimony, Katherine was serving a 20-year sentence for her involvement in the murder of Alonzo.

11

videotaped confession was introduced into evidence. In that videotaped statement, Katherine told police that on the date in question, she was in Jeanette's apartment with Jeanette, Lakesha, defendant, Terrance and Alonzo when defendant told her that Alonzo had admitted to molesting her child. According to Katherine, Terrance then began beating Alonzo with a broomstick and hit him approximately 20 to 30 times. As Alonzo was being beaten, defendant said, "He deserves this; he molested my child," and later "I want him dead." Defendant then held Alonzo down on the floor as Terrance pulled his pants off and sodomized him with a broomstick.

Katherine further told police that Alonzo attempted to escape from the apartment, but that defendant stopped him by kicking him in the face twice. Defendant and Terrance then brought Alonzo back to the apartment, and defendant tried to telephone her "baby daddy," so he could "jump on" Alonzo. However, when defendant was unable to reach her "baby daddy," she said, "F--k it. I will do this myself," and proceeded to drag Alonzo down the stairs, all the while praying, and repeating, "You are going to die."

According to Katherine's videotaped statement, defendant, together with Jeanette, Lakesha, and herself, put Alonzo inside the trunk of Derrick's car. Once the women all got inside the car, defendant said that she did not want Alonzo taken to the police station and that she wanted him dead. The women drove around the south side trying to locate defendant's "baby daddy" so that Alonzo could be "whooped," but when they were unsuccessful, they drove to a liquor store at 59th Street and State Street instead, where Katherine bought herself a drink. While at the liquor store, Lakesha opened the trunk in front of two or three men that she knew from the neighborhood and told them that she needed help and that "this man molested a baby."

12

When Lakesha opened the trunk, Alonzo was still alive and talking. Katherine heard what sounded like bottles hitting something.

According to Katherine's videotaped statement, once they left the liquor store, Jeanette again told everyone that Alonzo had also molested her child. Jeanette then suggested, "We can go to Lake Michigan," but defendant responded that she did not want to take Alonzo there because she "wanted him dead." According to Katherine, as they were driving around in the car, she could hear Alonzo pleading from the trunk, "Take me to the hospital. Take me to the police station. Sorry [La]quita [defendant], Sorry Jeanette." Defendant responded to his pleas with, "I'm not trying to hear that. You going to die tonight," and Jeanette chimed in, "You shouldn't have did what you did." Lakesha then turned up the volume on the radio.

According to Katherine's videotaped statement, soon thereafter they got a flat tire and could not proceed to Lake Michigan. Instead, they all went to defendant's aunt's house to obtain money to fix the tire. Once there, Lakesha fell asleep and did not return to the vehicle. Defendant then drove Jeanette and Katherine to a gas station at 55th Street and King Drive where they fixed the flat tire before proceeding to pick up Navon, defendant's other "baby daddy." Katherine told police that at this point she got into an argument with defendant and Jeanette because she "didn't want to be a part of this" and instead wanted to go home. Katherine was dropped off at her home soon thereafter. According to Katherine's videotaped statement, on the following morning, she went to Jeanette's apartment, where Jeanette told her that Alonzo was dead, and defendant explained to her that "Navon ran over Alonzo four times" and that she "cut him."

13

The State next called expert forensic pathologist and Cook County assistant chief medical examiner Dr. Mitra Kalelkar. Dr. Kalelkar testified that on March 1, 2004, she performed an autopsy on the victim, Alonzo Jones. According to Dr. Kalelkar, the external examination revealed numerous blunt and sharp force injuries on Alonzo's body, as well as gravel marks consistent with a body being run over by a vehicle and being dragged along the road. The internal examination showed extensive rib fractures, lacerations to the right lung, blood inside the victim's right chest cavity, and hemorrhages underneath the victim's scalp. Dr. Kalelkar concluded within a reasonable degree of scientific and medical certainty that the victim died as a result of multiple blunt and sharp force injuries to his body, including crushing injuries of the chest. In her opinion, the manner of death was homicide.

## 2. Jury Instruction Conference

After the State rested, and defense counsel's motion for a directed verdict was denied, the parties proceeded with a jury instruction conference. During that conference, the State proffered without objection a general murder verdict form, which permitted the jury to find defendant either guilty or not guilty of first degree murder without specifying whether that finding was made on the basis of intentional, knowing or felony murder. During that conference, the State also offered without objection a single jury instruction defining first degree murder in the following manner:

"A person commits the offense of first degree murder when he kills an individual

if, in performing the acts which cause the death:

he intends to kill or do great bodily harm to that individual; or

14

he knows that such acts will cause death to that individual; or

he knew that such acts create a strong probability of death or great bodily harm to that individual; or

he is committing the offense of kidnaping."

During the jury conference instruction, defense counsel requested instructions on second degree murder and involuntary manslaughter, but both requests were denied by the circuit court. The court also denied defense counsel's request to show the jury a picture of defendant's daughter, Denise.

### 3. Defendant's Case in Chief

Following the jury instruction conference, the defense proceeded by way of stipulation. The defense stipulated that if Yhana Wilkinson were called to testify she would state that she is a licensed, certified official court reporter and that on May 3, 2006, she reported certain proceedings wherein the witness Derrick Fleming testified to the following. Derrick did not believe that it was the intention of the involved parties to kill Alonzo but rather that it was their intention to take him to the police. According to Derrick's testimony at these proceedings, defendant and the other involved parties discussed taking Alonzo to the police station in his presence.

### 4. Closing Arguments and Jury Deliberations

After the defense rested, both parties proceeded with closing argument. During closing argument, the State argued that there was sufficient evidence for the jury to find defendant guilty of first degree murder under each of the following three theories: intentional, knowing and/or

felony murder. Although the State argued all three theories it focused on felony murder, by arguing:

"This is a perfect example of felony murder. The felony is kidnaping. And we've seen how [defendant] is guilty of kidnaping. She helps commit that crime. She forces Alonzo down those stairs and helps put him in the trunk of that car. And because she's guilty of kidnaping, because she combined with those women and Navon to kidnap Alonzo *** and because Alonzo dies during the course of that crime, she's guilty of murder period. It doesn't matter if she never intended Alonzo *** to die. It doesn't matter. It doesn't mater if she foresaw it. It doesn't matter. It doesn't matter if she didn't want Navon to do it. It doesn't matter. All that matters is that she committed kidnaping with those other participants and Alonzo died."

Following closing arguments, the jury returned general verdict forms finding defendant guilty of both first degree murder and kidnaping.

### B. Sentencing

After the denial of defense counsel's motion for a new trial, on November 16, 2006, the case proceeded to sentencing. At sentencing, the State presented a victim impact statement from Alonzo's aunt. The State argued that the extent of Alonzo's injuries and the fact that defendant was the ringleader who incited others to exact revenge on Alonzo warranted the maximum sentence. In mitigation, defense counsel argued that defendant had no prior history of violence and her record reflects only two minor offenses: (1) for drinking as a minor and (2) for possession of cannabis, for both of which she received supervision. More importantly, defense

counsel urged the court to consider the intense emotions that Alonzo's admission to having sexually assaulted defendant's one-year-old daughter would have evoked in defendant. Counsel also asked the court to consider the impact that defendant's prolonged incarceration would have on the development of her five children.

After hearing arguments in mitigation and aggravation, the trial judge sentenced defendant to the maximum sentence of 60 years' imprisonment for first degree murder and to a consecutive 7-year sentence for kidnaping. In doing so, the judge rejected defense counsel's argument that defendant had been acting under deep and intense emotional provocation and concluded instead that this was a "planned" and "calculated" murder carried out in a "dispassionate manner." The judge stated that defendant decided that she wanted Alonzo dead and that she and her accomplices drove around and brutally tortured Alonzo for three hours before killing him. The judge noted that he has "never seen a more horrendous, vicious crime than this one," and that defendant should "receive the same mercy [she] gave Alonzo." The judge therefore concluded that by taking the law into her own hands and deciding who should live and die, defendant "forfeited her right to live among a free society" and stated that it was his intention that defendant "never see the street again." Defendant now appeals.

## II. ANALYSIS

### A. General Verdict Form

On appeal, defendant first contends that the trial court erred in failing to provide separate first degree murder verdict forms. The State charged defendant by indictment with first degree murder under three different theories: intentional, knowing and felony murder. See 720 ILCS

17

5/9-1(a)(1) through (a)(3) (West 2002). The State also charged defendant with kidnaping. See

720 ILCS 5/10-1(a)(1), (a)(2) (West 2002). The trial court submitted the case to the jury with

general verdict forms for kidnaping as well as first degree murder. The general verdict form for

first degree murder allowed the jury to find defendant guilty of first degree murder without

specifying the theory upon which the jury relied. The jury returned general verdict forms of

guilty for both murder and for kidnaping. The trial judge sentenced defendant to 60 years'

imprisonment for murder and to a consecutive 7-year sentence for kidnaping.

Defendant contends that without special verdicts revealing the specific findings of the

jury, it is impossible to discern under what murder theory she was convicted, whether under a

theory of intentional, knowing or felony murder. Defendant maintains, and the State concedes,

that if the jury found her guilty under the theory of felony murder, rather than intentional or

knowing murder, such a finding would have precluded the trial court from sentencing her to a

consecutive 7-year sentence for the underlying felony of kidnaping. This argument is based

upon the undisputed principle that the underlying kidnaping felony is the predicate felony for the

felony murder charge, and as such is a lesser-included offense of felony murder that cannot

support a separate conviction and sentence. See People v. Smith, 233 Ill. 2d 1, 17 (2009)

("[a]ccording to Illinois law, the predicate felony underlying a charge of felony murder is a

lesser-included offense of felony murder. Thus *** a defendant convicted of felony murder may

not be convicted on the underlying felony. In such instances, the predicate offense will not

support a separate conviction or sentence"); see also People v. Battle, 393 Ill. App. 3d 302, 313-

14 (2009), citing People v. Coady, 156 Ill. 2d 531, 537 (1993). Because defendant here did in

fact receive consecutive sentences for her kidnaping and murder convictions, she maintains that the failure to provide the jury with specific verdict forms prejudiced the outcome of her case and requires this court to reverse her conviction and sentence.

Defendant concedes that she did not request separate verdict forms and did not object to the use of a general verdict form during trial, but contends that this court should nevertheless review the issue as ineffective assistance of counsel or in the alternative as plain error. We will address each of her contentions in turn.

### 1. Plain Error

We begin with plain error. The plain error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error if either the evidence is close, or if the error affects substantial rights. People v. Herron, 215 Ill. 2d 167, 186-87 (2005). In either instance, defendant must preliminarily establish that there was error. Herron, 215 Ill. 2d at 187. Once she does so, in the first instance, she must also prove "prejudicial error," *i.e.,* that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against her. Herron, 215 Ill. 2d at 187. Alternatively, in the second instance, defendant must prove that the error was structural, or so serious that it affected the fairness of her proceeding and challenged the integrity of the judicial process. See People v. Davis, 233 Ill. 2d 244, 273-74 (2009); Herron, 215 Ill. 2d at 187. In either instance, the burden of persuasion remains on the defendant. Herron, 215 Ill. 2d at 187, citing People v. Hopp, 209 Ill. 2d 1, 12 (2004).

Defendant here maintains that it was error not to tender a specific verdict form to the jury

19

*sua sponte*. Defendant's argument is premised on our supreme court's decision in <u>Smith</u>, 233 Ill. 2d 1. In that consolidated case, defendants were each charged, among other things, with armed robbery and with intentional, knowing and felony murder. <u>Smith</u>, 233 Ill. 2d at 5. Each defendant requested that the jury be given special verdict forms for each of the separate murder theories, but that request was denied by the trial court. <u>Smith</u>, 233 Ill. 2d at 10. Instead, the trial court submitted to the jury a general verdict form for first degree murder with instruction to the jury to sign the verdict form if it found defendants guilty under any of the three murder theories. <u>Smith</u>, 233 Ill. 2d at 10. Each jury returned a general verdict of guilty for both the murder and the armed robbery charges, and defendants were sentenced to consecutive terms of imprisonment for each crime. <u>Smith</u>, 233 Ill. 2d at 13.

Each defendant in <u>Smith</u> contended that it was error for the trial court to deny their respective requests for separate verdict forms because each jury's specific findings could result in different sentencing consequences, in that if the convictions were for felony murder, defendants could not be subject to sentencing for the underlying felony of armed robbery for the reasons already discussed above, namely, that the predicate felony underlying a charge of felony murder is a lesser-included offense of felony murder. <u>Smith</u>, 233 Ill. 2d at 13. The State in <u>Smith</u> urged that the two verdicts could stand under the so-called "one-good-count rule," which permits a reviewing court to presume that where a defendant is charged and prosecuted under all three theories of murder, and the jury returns a general verdict of guilty without specifying the murder theory upon which it found defendant guilty, the jury found defendant guilty of the most culpable mental state, intentional murder. <u>Smith</u>, 233 Ill. 2d at 19-20.

Our supreme court agreed with defendants and held that where "specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided upon request and the failure to provide them is an abuse of discretion." Smith, 233 Ill. 2d at 23.  Our supreme court further held that "because the presumption that arises from application of the 'one-good-count rule' could work a prejudice against [defendants] at sentencing, the presumption cannot substitute for the jury's actual findings, at least where defendants have requested that the jury make specific findings with regard to the degree of the offense."  Smith, 233 Ill. 2d at 23.  Lastly, the court in Smith held that any such error arising from the trial courts' denial of requests for special verdict forms could not be disposed of under harmless error analysis because that would require the court to improperly invade the province of the jury and substitute its evaluation of the evidence for their findings of fact.  Smith, 233 Ill. 2d at 25.

With respect to the appropriate remedy, our supreme court in Smith stated that the general verdict was valid to establish guilt and that the only issue was how to interpret the verdict for purposes of sentencing.  Smith, 233 Ill. 2d at 28.  The court recognized that the presumption arising from the "one-good-count rule" could not be maintained because "the trial court refused the defendants' request for separate verdict forms, which would have made the basis of the juries' finding clear."  Smith, 233 Ill. 2d at 28.  Thus, our supreme court in Smith held that under those circumstances for purposes of sentencing it was compelled to consider the general verdict as a finding of guilty of felony murder.  Smith, 233 Ill. 2d at 28.  The court then affirmed the murder convictions but vacated the convictions and sentences for the purported

21

underlying felonies. Smith, 233 Ill. 2d at 29.

In the present case, the State argues that the holding in Smith is limited to instances where special verdict forms are requested and denied by the court and that consequently the trial court did not commit error in failing to tender special verdict forms to the jury *sua sponte*, since they were not requested by the defense. The State supports its position by citing to the aforementioned language of Smith itself, as well as by relying on the subsequent decision of our supreme court in Davis, 233 Ill. 2d 244, which, the State purports, explicitly limited the holding in Smith to requests for special verdict forms. The State further argues that even if the court erred in its failure to tender the specific verdict forms, defendant has failed to establish that she was prejudiced under the first prong of the plain error analysis so as to be able to proceed with this issue on appeal. We agree with the State.

The State's position is consistent with our supreme court's subsequent decision in Davis, 233 Ill. 2d 244. In Davis, the defendant was charged with aggravated battery and with intentional, knowing and felony murder. Davis, 233 Ill. 2d at 247. The felony murder charge was predicated on the underlying offense of aggravated battery. Davis, 233 Ill. 2d at 247. Upon the State's request, and without objection from defendant, the jury was instructed that it could find defendant guilty of murder under any of the three murder theories, intentional, knowing or felony murder. Davis, 233 Ill. 2d at 247. The defendant never requested a special verdict form, and the jury returned a general guilty verdict of first degree murder and a guilty verdict for aggravated battery. Davis, 233 Ill. 2d at 247. On appeal, the defendant challenged his murder conviction, contending that it was reversible error to instruct the jury that felony murder could be

predicated upon aggravated battery because it is well settled that " 'the predicate felony underlying the charge of felony murder must have an independent felonious purpose.' " Davis, 233 Ill. 2d at 264, quoting People v. Morgan, 197 Ill. 2d 404, 458 (2001). Defendant argued that the conduct forming the basis of his aggravated battery charge, *i.e.*, that he "beat the victim with his fists, feet and a board," was inherent in the murder itself, and had no independent felonious purpose, so that the jury should not have been instructed that it could find defendant guilty of felony murder solely on the basis of his commission of that underlying offense. Davis, 233 Ill. 2d at 264-65. Defendant argued that since he was convicted on a general verdict form it was impossible to determine whether the jury found him guilty under the erroneous felony murder instruction. Davis, 233 Ill. 2d at 265. He therefore urged the court not to apply the one-good-count rule, under which it is presumed that a defendant charged with all three theories of first degree murder, and convicted under a general verdict form, is guilty of intentional murder, so as to vitiate such an erroneous verdict. Davis, 233 Ill. 2d at 265.

Our supreme court disagreed with defendant, upholding the one-good-count principle and finding that under its application defendant's verdict could stand. Davis, 233 Ill. 2d at 273. In doing so, the court specifically addressed its decision in Smith and found that Smith did not intend to create a rule requiring the trial court to *sua sponte* give specific verdict forms. Davis, 233 Ill. 2d at 273. As the court in Davis explained:

> "This court in Smith affirmed the murder conviction, but vacated the conviction
> and sentence for attempted armed robbery. In so doing, this court's holding was narrow:
> 'where, as here, specific findings by the jury with regard to the offenses charged could

23

result in different sentencing consequences, favorable to the defendant, specific verdict

forms must be provided upon request and the failure to provide them is an abuse of

discretion.' *** [Citation.] This court was also careful to note that the defendant was not

arguing that his convictions for murder should be set aside and was not repudiating the

'one-good-count rule.' [Citation.] This court concluded by finding that the error of

refusing the defendant's request where it could ultimately be key to his receiving more

severe sentencing was not subject to a harmless-error analysis. [Citation.]

The present case is a world away from Smith. Here, defendant did not object to

the general verdict form and did not request a special verdict form. Again, the holding of

Smith was conditioned on the trial court's refusal to grant such a request and did not

establish a rule that the court must act *sua sponte* to give a specific verdict form.

Additionally, defendant is challenging the validity of the one-good-count rule, something

which was expressly not done in Smith." (Emphasis omitted.) Davis, 233 Ill. 2d at 273.

Since the decision in Davis, the merits of defendant's position in this case and her

attempt to invoke Smith to require *sua sponte* submission of special verdict forms even without a

request by the defendant have been comprehensively examined and rejected by the plurality in

People v. Moore, 397 Ill. App. 3d 555 (2009) (opinion of Coleman, J., joined by Quinn, J.). In

Moore, defendant was charged with first degree murder and armed robbery and the jury was

instructed on intentional murder, knowing murder and felony murder. Moore, 397 Ill. App. 3d at

563. Just as here, in Moore, the defense did not object to this instruction, nor did it offer specific

murder verdict forms for submission to the jury. Moore, 397 Ill. App. 3d at 563. The jury

returned a general verdict of guilty of both first degree murder and armed robbery, and defendant was sentenced to consecutive terms of 30 years' and 6 years' imprisonment, respectively. Moore, 397 Ill. App. 3d at 556. In that case, just as here, citing to Smith, defendant argued that for sentencing purposes, "the general murder verdict cannot be presumed [under the one-good-count rule] to represent a finding that [defendant] was guilty of either intentional or knowing murder, and that in the absence of such presumption, the jury's verdict must be considered a finding on the felony murder charge." Moore, 397 Ill. App. 3d at 563-64. Accordingly, defendant in Moore argued that his conviction and sentence for armed robbery, a lesser included offense of murder, must be vacated. Moore, 397 Ill. App. 3d at 564.

In rejecting defendant's argument, the plurality in Moore first recognized the continued viability of the one-good-count rule. Moore, 397 Ill. App. 3d at 564, citing People v. Cardona, 158 Ill. 2d 403, 411-12 (1994), and People v. Thompkins, 121 Ill. 2d 401, 455-56 (1988). Next, relying on the supreme court's decision in Davis, the plurality in Moore found that our supreme court had explicitly limited the holding in Smith to situations wherein a defendant requests a separate verdict form and his request is denied. Moore, 397 Ill. App. 3d at 565. Accordingly, the Moore plurality held that the Smith decision did not disturb the one-count-principle, under which it could be presumed that the jury found defendant guilty of intentional murder, nor did it impose a *sua sponte* duty on the trial court to give specific verdict forms. Moore, 397 Ill. App. 3d at 566. As the plurality in Moore explained:

"Although portions of the Smith opinion suggest disapproval of the use of the

one-good-count rule to subject a defendant to more severe sentencing, the court's

25

discussion is clearly dependent on the case's procedural context: the trial court denied the defense request to submit separate verdict forms to the jury. The Smith court repeatedly noted this context: 'it is a violation of due process to deny a defendant the opportunity to have the jury decide his theory of defense' [citation]); 'because the presumption that arises from application of the "one-good-count rule" could work a prejudice against [defendants] at sentencing, the presumption cannot substitute for the jury's actual findings, *at least where defendants have requested that the jury make specific findings with regard to the degree of the offense* (emphasis added) [citation]; 'the trial courts erred when they refused defendants' requests for separate verdict forms.' [Citation.]

The significance of this procedural context has been confirmed by the supreme court [in Davis]." Moore, 397 Ill. App. 3d at 565-66.

The plurality in Moore continued:

"[T]he one-good-count principle has long been employed to permit enhanced sentencing, including the imposition of consecutive sentences for additional felonies, by construing a general first degree murder verdict as a finding of guilt on an intentional murder charge. We believe that this use of the principle is among the corollary rules explicitly left undisturbed by Smith. The Davis court's discussion of Smith demonstrates that the distinguishing factor entitling the defendant to relief from the application of the one-good-count principle in Smith was the request for separate verdict forms at trial, not the mere possibility that the principle would subject him to increased punishment. Accordingly, we reject Moore's argument that he is entitled to the relief granted in Smith

26

because he, like the defendant there, received consecutive sentences, while the defendant in Davis did not. Since Moore did not request separate verdict forms in the instant case, we hold that Smith offers no support for his assertion that the general murder verdict could not support his armed robbery conviction." Moore, 397 Ill. App. 3d at 566.

Defendant nevertheless urges that we should adopt the view of the dissent in Moore. The dissent posits that Davis does not purport to modify the finding in Smith that regardless of whether special verdicts are requested, or not, a sentence is void where it was impossible to tell from the general verdict whether the jury convicted defendant of intentional murder. Moore, 397 Ill. App. 3d at 578 (Theis, J., dissenting). According to the dissent, Smith and Davis are mutually distinguishable because Davis did not involve a failure to give special verdict forms but, rather, focused on the propriety of giving a felony murder instruction, where such an instruction may not have been warranted. Moore, 397 Ill. App. 3d at 576 (Theis, J., dissenting). As already pointed out above, Davis addressed whether a trial court erred when it instructed the jury that felony murder could be predicated upon an underlying aggravated battery where the conduct underlying the battery and the murder were the same and had no separate felonious purpose. Davis, 233 Ill. 2d at 264. Unlike Davis, where defendant merely challenged the propriety of the instruction with respect to the theory upon which he was convicted for murder, in Smith, the defendants challenged the validity of their convictions and sentence for both the murder and the underlying offense, contending that the denial of special verdict forms resulted in the possibility that they were subjected to increased punishment based upon the application of the one-good-count rule. Smith, 233 Ill. 2d at 23.

The dissent therefore posits that unlike the issue in <u>Davis</u>, the issue in <u>Smith</u> was the failure to tender special verdict forms. The dissent urges that the error in failing to provide special verdict forms could result in increased punishment to a defendant and is therefore deserving of different treatment than the failure to give a proper felony murder instruction. <u>Moore</u>, 397 Ill. App. 3d at 578 (Theis, J., dissenting). Thus, the dissent concludes that the error to give specific verdict forms is presumptively prejudicial under any plain error analysis while the failure to give an instruction is not. <u>Moore</u>, 397 Ill. App. 3d at 578 (Theis, J., dissenting).

While we cannot disagree with the factual distinction between <u>Davis</u> and <u>Smith</u> as pointed out by the thoughtful dissent, we are nevertheless persuaded by our supreme court's specific interpretation in <u>Davis</u> of its own prior holding in <u>Smith</u> in which it unqualifiedly stated that: "the holding of <u>Smith</u> was conditioned on the trial court's refusal to grant such a request and did not establish a rule that the court must act *sua sponte* to give a specific verdict form." <u>Davis</u>, 233 Ill. 2d at 273. Nor can we overlook the express language in <u>Smith</u>, which, in the very least, raised the question as to whether its holding extended beyond the failure of a trial court to grant defendant's request to special verdict forms. See <u>Smith</u>, 233 Ill. 2d at 23, 28 ("specific verdict forms must be provided *upon request* and the failure to provide them is an abuse of discretion" (emphasis added); "because the presumption that arises from application of the 'one good count rule' could work a prejudice against [defendants] at sentencing, the presumption cannot substitute for the jury's actual findings, *at least where defendants have requested that the jury make specific findings* with regard to the degree of the offense" (emphasis added); further noting that the presumption arising from the "one good count rule" could not be maintained

28

because "the trial courts *refused the defendants' request for separate verdict forms*, which would have made the basis for the juries' finding clear" (emphasis added)).

Our view and the view of the plurality in <u>Moore</u> are supported by several other more recent decisions of this appellate court, which have similarly rejected extending <u>Smith</u> to situations wherein defendant did not request special verdict forms. See <u>People v. Braboy</u>, 393 Ill. App. 3d 100, 108 (2009) ("The <u>Smith</u> case as it stands today is limited to situations in which the trial court actually denied a request for separate verdict forms. [Citations.] If our supreme court wishes to expand this to a mandatory requirement that knowing, intentional, and felony murder always have separate verdict forms due to the different sentencing consequences then it can do so. It si not our place to expand the holding of <u>Smith</u>"); <u>People v. Mabry</u>, 398 Ill. App. 3d 745, 755 (2010) ("we decline to extend <u>Smith</u> to situations where counsel did not request separate verdict forms"); see also <u>People v. Allen</u>, No. 1-08-0354, slip op. at 26 (May 25, 2010) (holding that were defendant failed to object to a general verdict form "<u>Smith</u> [was] inapplicable since <u>Smith</u> is limited to situations in which the trial court actually denied a request for separate verdict forms").

Accordingly, applying the holding of the <u>Moore</u> plurality and its progeny to the case at bar, we find that defendant here, cannot establish that the trial court was required to *sua sponte* tender separate verdict forms to the jury, and that failure to do so amounted to error. Since there was no error, there can be no plain error. <u>People v. Sims</u>, No. 1-09-0357, slip op. at 14 (June 30, 2010), citing <u>People v. Bannister</u>, 232 Ill. 2d 52, 65 (2008) ("without error, there can be no plain error"); see also <u>People v. Hanson</u>, No. 106566, slip op. at 31 (June 24, 2010) ("Finding no error,

our plain-error analysis ends here"); see also People v. Hommerson, 399 Ill. App. 3d 405, 412 (2010) ("Since we find, *** that no error occurred, we do not need to perform a plain-error analysis"); People v. Strickland, 399 Ill. App. 3d 590, 604 (2010) ("Because no error occurred, there can be no plain error"). Therefore, under the one-count-rule, defendant is presumed guilty of the most serious offense of intentional murder and the trial court's judgment and sentence were proper. See Moore, 397 Ill. App. 3d at 566; Braboy, 393 Ill. App. 3d at 108; People v. Mabry, 398 Ill. App. 3d 745, 755 (2010); see also Allen, slip op. at 126-27.

### 2. Ineffective Assistance of Counsel

Defendant contends in the alternative that we should find that counsel's failure to object to the general verdict form or to request a specific verdict form constituted ineffective assistance of counsel. Whether defendant was denied effective assistance of counsel is evaluated in accordance with the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Under Strickland, to prevail on a claim of ineffective assistance, defendant must show both that (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance so prejudiced the defense as to deny defendant a fair trial. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; see also People v. Bloomingburg, 346 Ill. App. 3d 308, 316-17 (2004). The failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

As to the first prong, defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction of counsel was a valid trial strategy.

Bloomingburg, 346 Ill. App. 3d at 317; 3 W. LaFave, Criminal Procedure §11.10(c) at 715 (2d ed. 1999)). The reasonableness of counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, and without hindsight, in light of the totality of circumstances, and not just on the basis of isolated acts. People v. Kelley, 304 Ill. App. 3d 628, 634 (1999). Because effective assistance refers to competent and not perfect representation (People v. Odle, 151 Ill. 2d 168, 173 (1992)), mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent (People v. Palmer, 162 Ill. 2d 465, 476 (1994)).

Since the decisions in Smith and Davis, our appellate courts have repeatedly held that "counsel's decision to proceed with a general verdict form" in lieu of specific verdict forms, falls within the realm of trial strategy and will be considered objectively reasonable "where the law did not and does not place a mandatory burden on counsel to request separate verdict forms." Braboy, 393 Ill. App. 3d at 108; see also Mabry, 398 Ill. App. 3d at 755.

Defendant here has failed to overcome the presumption that counsel's failure to request special verdict forms was part of a reasonable trial strategy. Defense counsel's decision to proceed with a general verdict form could have been premised on the fear that giving the jury special verdict forms would make it easier for them to find defendant guilty of murder under the theory of felony murder, since, there was overwhelming evidence of defendant's participation in the underlying kidnaping, and since such a special verdict form would permit the jury to focus on felony murder separately from the intentional and knowing murder theories.

It would have been reasonable for defense counsel to conclude that his client had a better

31

chance of prevailing on intentional murder since the focus on the element of intent would provide the jury with more latitude to reach a more lenient verdict. Counsel could have tactically concluded that it was better to present the jury with a general verdict form, which simply asks the jury whether defendant is "a murderess," rather than a special verdict form, which specifically itemizes the elements of felony murder asking the jury to determine whether she is "a kidnapper," and then permitting them to find her guilty of murder strictly on the mechanical basis of her involvement in the kidnaping. This is particularly true where tactically defense counsel could have felt that his client had an opportunity to get some degree of sympathy from the jury because of the provocation under which she committed the crime, namely, her discovery and belief that Alonzo had raped her infant daughter. Consequently, we find that defense counsel's decision to proceed with a general verdict form could very well have been the product of a sensible trial strategy. Braboy, 393 Ill. App. 3d at 108; see also Mabry, 398 Ill. App. 3d at 755.

Because defendant has failed to make the requisite showing of counsel's deficient performance under the first prong of the Strickland analysis, we need not proceed to the prejudice prong. See Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064 (noting that the failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim). For the aforementioned reasons, we conclude that defendant was not deprived of her constitutional right to effective assistance of counsel. See *e.g.*, Braboy, 393 Ill. App. 3d at 108; see also Mabry, 398 Ill. App. 3d at 755.

### B. Abuse of Discretion in Sentencing

Defendant next contends that the court abused its sentencing discretion by imposing the maximum 60-year sentence for first degree murder. She specifically maintains that the trial judge failed to consider several mitigating factors demonstrating her rehabilitative potential, including, her age at sentencing (25 years old), her lack of significant criminal history (only two minor convictions for possession of cannabis and drinking as a minor), and the steps that she took to take responsibility for her actions (turning herself into police voluntarily and confessing to the crime). More importantly, defendant contends that the trial court refused to consider the fact that she had learned that Alonzo had sexually assaulted her one-year-old daughter as a mitigating factor on her behalf. Rather, defendant maintains, the trial judge used this fact as an aggravating factor to find that defendant deserved the maximum sentence because she "unilaterally decided to take the law into her own hands" to punish Alonzo. For the reasons that follow, we agree.

Generally, where, as here, a sentence imposed by the trial court is within the statutory limits permitted for the felony of which defendant was convicted[4] (730 ILCS 5/5-8-1(a)(3) (West 2000)), we will not disturb the sentence absent an abuse of discretion by the court. People v. Coleman, 166 Ill. 2d 247, 258 (1995). The reasoning is, of course, that the trial court is in a better position to consider, among other things, the credibility, demeanor, general moral character, mentality, social environment, habits and age of the defendant. People v. O'Neal, 125 Ill. 2d 291, 298 (1988). "However, the mere fact that the trial court has a superior opportunity to

---

[4]In the present case, defendant was convicted of first degree murder, which mandates a sentence between 20 and 60 years' imprisonment. 730 ILCS 5/5-8-1(a)(1)(a) (West 2000).

33

make a determination concerning final disposition and punishment of a defendant does not imply that a particular sentence imposed is always just and equitable." O'Neal, 125 Ill. 2d at 298. Accordingly, an abuse of discretion will be found "even where the sentence is within the statutory limitations, *** if that sentence is greatly at variance with the purpose and spirit of the law." People v. Steffens, 131 Ill. App. 3d 141, 151 (1985).

The Illinois Constitution requires that penalties be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, §11; People v. Center, 198 Ill. App. 3d 1025, 1032-33 (1990). "This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment." People v. Quintana, 332 Ill. App. 3d 96, 109 (2002). In determining the appropriate sentence, the trial court must carefully consider all of the factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it. Quintana, 332 Ill. App. 3d at 109.

In the present case, the comments of the trial judge in imposing the sentence reflect failure by the trial judge to recognize the full nature and extent of the provocation experienced by defendant upon her determination that Alonzo had apparently raped her infant daughter. While the trial judge may have questioned whether such molestation had occurred, he never questioned or attempted to negate the fact that defendant was sincere in her belief that such molestation did occur. Nor did that trial judge appear to fully recognize that the factual basis for

34

this provocation was corroborated by the disclosure of codefendant Jeanette at the scene, that the same act had been committed by Alonzo against her daughter, and that consequently the belief of defendant in this provocation was enhanced.

Section 5-5-3.1(a) of the Unified Code of Corrections mandates that in imposing a sentence the trial judge consider as a mitigating factor whether defendant acted under "strong provocation," or whether there were circumstance which would "excuse or justify the defendant's criminal conduct" even if those circumstances would have been "insufficient to establish a defense," or reduce the charge from first degree to second degree murder. 730 ILCS 5/5-5-3.1(a) (West 2002)[5]; see also People v. Merritte, 242 Ill. App. 3d 485, 492 (1993) ("strong provocation as a mitigating factor at sentencing encompasses a wider range of conduct than that defined as serious provocation under the second degree murder statute"). The language in section 5-5-3.1 of the Unified Code of Corrections is "mandatory, rather than directory," and the

_____

[5]Section 5-5-3.1(a) states in pertinent part:

"The following grounds *shall* be accorded weight in favor of withholding or minimizing a sentence of imprisonment:

* * *

(3) The defendant acted under a strong provocation.

(4) There were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense." (Emphasis added.) 730 ILCS 5/5-5-3.1(a) (West 2002).

"sentencing authority may not refuse to consider relevant evidence presented in mitigation." People v. Heinz, 391 Ill. App. 3d 854, 865 (2009).

While the term "strong provocation" is not defined in the Unified Code of Corrections, the similar term "serious provocation" has a well-established meaning under Illinois law. Merritte, 242 Ill. App. 3d at 492. Serious provocation is defined as " 'conduct sufficient to excite an intense passion in a reasonable person.' " People v. Banks, 227 Ill. App. 3d 462, 473 (1992), quoting, Ill. Rev. Stat. 1987, ch. 38, par. 9-2(b); see also People v. Wilks, 175 Ill. App. 3d 68, 75 (1988) ("the law acknowledges the mitigating effect of human weakness and intense passion *** where the person *** acted under a sudden and intense passion resulting from serious provocation sufficient to excite the passion of a reasonable person"). When considering whether an individual has acted under serious provocation sufficient to reduce the offense of first degree murder to second degree murder, the categories of serious provocation recognized by our courts are: substantial physical injury or assault, mutual quarrel or combat, illegal arrest and spousal adultery. Merritte, 242 Ill. App. 3d at 492. Serious provocation arising from substantial physical injury or assault extends to injuries to family members, including children. See, *e.g.*, People v. Rice, 351 Ill. 604, 609 (1933) (evidence that victim slapped defendant's child supported conviction for manslaughter); Commonwealth v. Berry, 461 Pa. 233, 238, 336 A.2d 262, 264 (1975) (held that "threatened or immediate infliction of serious injury upon a parent, spouse or child" sufficient provocation to reduce the killing to voluntary manslaughter); Paz v. State, 777 So. 2d 983 (Fla. App. 2000) (reducing murder conviction to voluntary manslaughter where defendant killed the victim after defendants' wife indicated that the victim had sexually

36

assaulted her); People v. Brooks, 185 Cal. App. 3d 687, 689-92, 230 Cal. Rptr. 86, 90 (1986) (holding that defendant was entitled to a voluntary manslaughter instruction for killing his brother's murderer after learning of the murder); see also 3 W. LaFave §15.2(b)(7), at 502 (2nd ed. 1999)("just as a reasonable man may be provoked by some sots of conduct which inflict injury upon himself, so too he may be provoked by the same sorts of conduct which causes injury to his close relatives").

In the present case, contrary to the State's assertion, the record effectively demonstrates that instead of focusing on the undeniably egregious nature of the provocation, the trial judge chose to focus on the defendant's actions responding to that provocation as vigilantism, thereby warranting higher punishment.[6] Obviously, vigilante justice renders the perpetrator culpable and subject to legal penalties imposed. But, in imposing these penalties the trial judge is nevertheless under a duty to consider the fact that the vigilante justice taken was neither casual nor random but rather committed in response to provocation that objectively would be as

---

[6]This attitude may well be discernable in comparing the sentences that the same judge gave to the other codefendants in this case. While defendant was sentenced to 60 years' imprisonment on her first degree murder charge, codefendants Katherine and Lakesha, each received 20-years sentences in exchange for guilty pleas to first degree murder. Similarly, Terrance, who was convicted of felony murder received a 28-year sentence. Although we recognize that sentences given to codefendants are not dispositive of discretionary abuse, nevertheless they can serve as an indication of the trial judge's evaluation of the relative offenses.

extreme as any mother of any child could sustain. See, *e.g.*, S. Morse, <u>Undiminished Confusion in Diminished Capacity</u>, 75 J. Crim. L. & Criminology 1, 34 (1984) (noting that most parents would become enraged at anyone who harmed or sexually assaulted their child); see also <u>Lee v. United States</u>, 959 A.2d 1141, 1144-45 (D.C. App. 2008) (defendant was entitled to a voluntary manslaughter instruction where there was evidence that he stabbed to death his 11-year-old daughter's molester after the child told the defendant that the adult man had kissed and licked her); <u>State v. Munoz</u>, 827 P.2d 1303, 113 N.M. 489 (App. 1992) (defendant entitled to voluntary manslaughter instruction where he killed father-in-law after learning father-in-law sexually molested daughter); <u>Toler v. State</u>, 152 Tenn. 1, 260 S.W. 134 (1924) (father adequately provoked where he killed a close family friend after learning that his friend had coaxed the father's 15-year-old daughter into drinking whiskey so he could sexually abuse the child in a field near father's home).

Moreover, in failing to give due recognition to the provocation, the trial judge failed to recognize that in light of such provocation, there was very little, if any, likelihood that defendant would be a recidivist offender, so as to permit the full breath of her rehabilitative potential. See Ill. Const. 1970, art. I, §11 ("[a]ll penalties shall be determined both according to the seriousness of the offense and *with the objective of restoring the offender to useful citizenship*"(emphasis added)); see also 730 ILCS 5/1-1-2 (West 2002) ("[t]he purpose of the [Unified] Code of Corrections is to, [*inter alia*] *** *permit the recognition of differences in rehabilitation possibilities among individual offenders *** and *restore offenders to useful citizenship*" (emphasis added)); see also <u>People v. Lewis</u>, 89 Ill. App. 3d 15, 21 (1980) (noting that fact that

defendant is not likely to repeat his failure is factor to be considered by trial court in imposing a

sentence); see also People v. Glass, 98 Ill. App. 3d 641, 644 (1981) (noting that in imposing a

sentence the defendants' motive for committing the offense is relevant to whether the

defendant's conduct was a result of circumstances unlikely to recur); see also People v. Black,

223 Ill. App. 3d 630, 634 (1992) (noting that it was proper for the trial court for sentencing

purposes to consider whether defendant's character showed he was unlikely to commit future

crimes and whether circumstances were unlikely to recur).

The State nevertheless contends that the trial court properly sentenced defendant to the

maximum sentence permitted by statute simply on the basis of the brutality of the crime. While

we acknowledge that "the seriousness of the crime" has been held to be "the most important

factor in fashioning an appropriate sentence," (People v. Weatherspoon, 394 Ill. App. 3d 839,

862 (2009)), this does not relieve the sentencing judge from considering the requisite mitigating

factors as articulated under the Unified Code of Corrections (see People v. Markiewicz, 246 Ill.

App. 3d 31, 55 (1993)). We do not approve or purport in any way to sanction the conduct of this

defendant in the murder of Alonzo nor do we condone the brutal manner by which it was

committed. However, it would seem that accountability for that conduct can be reflected in a

sentence that would nevertheless still recognize the impact of the vengeful pain and anger

experienced by a mother upon discovering the sexual assault perpetrated by the adult victim on

her infant daughter, as well as the fact that defendant, acting solely out of such egregious

provocation, was unlikely to repeat the offense in the future. Rather, in sentencing defendant,

the trial judge left no room for either of these factors, maximizing the sentence to the full extent

39

permitted by statute, and on top of that adding a seven-year sentence for the underlying offense to be served consecutively. Our courts have never been reluctant to reduce a sentence on appeal, despite the serious nature of the underlying crime, where a trial court has neglected its duty to consider the relevant mitigating factors. See, *e.g.*, People v. Crews, 42 Ill. 2d 60, 66 (1969) (holding that even though society was rightly outraged by the nature of the offense, in that case the murder of a child, the defendant's sentence for murder had to be reduced in light of the fact that she had no prior criminal background; noting that "in determining punishment for the crime, care must be taken to insure that the punishment is appropriate and just," and that this must "include a consideration of background and circumstances which affect punishment"); see also People v. Maggette, 195 Ill. 2d 336, 355 (2001) (holding that 10-year prison sentence on residential burglary conviction was manifestly disproportionate to the nature of the offense, despite the "appalling and harmful nature" of defendant's alleged sexual conduct toward the victim sleeping on sofa, and sentence would be reduced on appeal to 5 years); People v. Merritt, 53 Ill. App. 3d 929, 930-32 (1977) (holding that although defendant had committed "repeated violent criminal acts," "in the interest of his rehabilitation and so that the appearance of vengeance may be avoided" four concurrent sentences of 40 to 65 years imposed on conviction of two counts of rape and two counts of aggravated kidnaping would be reduced to concurrent terms of 15 to 45 years where defendant was only 20 years old and his only prior conviction was misdemeanor); see also People v. Blackwell, 171 Ill. 2d 338, 364 (1996), quoting, People v. Johnson, 128 Ill. 2d 253, 282 (1989) (holding that despite the "seriousness of defendant's actions" in committing the murder, defendant's sentence had to be reduced because " 'defendant

ha[d] led a relatively blameless life except for this one explosive episode' ").

Accordingly, for the aforementioned reasons, we remand to the circuit court for a new sentencing hearing with instructions to the trial judge to give due reflection and implementation of the relevant mitigating factors. Based upon these mitigating factors, which include defendant's undeniably strong provocation, her lack of any venial criminal record, and the manifest unlikelihood of any repetition of this crime, we strongly believe that a proper sentence fort this defendant would be at the minimal sentencing level for first degree murder, to which we would recommend that the presence sentence be reduced.

## C. Mittimus

Defendant finally contends, and the State concedes, that the mittimus must be corrected to reflect that she was convicted of one count of first degree murder (720 ILCS 5/9-1 (West 2002)) and one count of kidnaping (720 ILCS 5/10-1 (West 2002)) rather than two counts of first degree murder, pursuant to sections 9-1(a)(1) and 9-1(a)(3) of the Criminal Code of 1961 (the Criminal Code) (720 ILCS 5/9-1(a)(1), (a)(3) (West 2002)). The parties agree that the mittimus was made in error and does not properly reflect the jury's verdict or the sentence imposed by the court.

The mittimus currently reflects that defendant was convicted of one count of first degree murder pursuant to section 9-1(a)(1) of the Criminal Code (intentional murder), and sentenced to 60 years imprisonment. It further reflects that defendant was also convicted of one count of first degree murder pursuant to section 9-1(a)(3) of the Criminal Code (felony murder), and sentenced to seven years' imprisonment. The parties agree that this is incorrect and that

41

defendant was convicted of only one count of first degree murder (720 ILCS 5/9-1 (West 2002)), and that the second conviction and seven-year sentence were for kidnaping under section 10-1 of the Criminal Code (720 ILCS 5/10-1 (West 2002)).

Accordingly, pursuant to Supreme Court Rule 615(b)(1), we order the clerk of the circuit court to make the necessary corrections as far as eliminating the conviction for felony murder, and replacing it with a conviction for kidnaping. 134 Ill. 2d R. 615(b)(1) ("[o]n appeal the reviewing court may *** modify the judgment or order from which the appeal is taken"); see also People v. McCray, 273 Ill. App. 3d 396, 403 (1995) ("[r]emandment is unnecessary since this court has the authority to directly order the clerk of the circuit court to make the necessary corrections); People v. DeWeese, 298 Ill. App. 3d 4, 13 (1998) (correcting the mittimus to reflect the proper conviction). We, however, remand for a new sentencing hearing with respect to the conviction of first degree murder.

Affirmed in part; reversed and remanded in part; mittimus corrected.

McBRIDE, and ROBERT GORDON, J.J., concur.

No. 1-07-0266

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**
**(Front Sheet to be Attached to Each Case)**

Please use the following form

THE PEOPLE OF THE STATE OF ILLINOIS,

                 Plaintiff-Appellee,

v.

LAQUITA CALHOUN,

                 Defendant-Appellant.

---

Docket No.

COURT

Opinion
Filed

No. 1-07-0266

Appellate Court of Illinois
First District, FIFTH Division

SEPTEMBER 10, 2010
(Give month, day and year)

---

JUSTICES

JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:
JUSTICE McBRIDE and JUSTICE ROBERT E. GORDON, concur.

---

APPEAL from the
Circuit Court of Cook
County; the Hon___
Judge Presiding.

Lower Court and Trial Judge(s) in form indicated in margin:

Appeal from the Circuit Court of Cook County;

The Hon. Stanley J. Sacks Judge presiding.

---

APPELLANTS
John Doe, of Chicago

For APPELLEES,  :

Smith and Smith of
Chicago,

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel.  Indicate the word FOR NONE if not represented.

FOR APPELLANT: Michael Pelletier, Patricia Unsinn, and Lauren M. Bauser, Office of the State Appellate Defender, 203 N. LaSalle Street, 24th Floor, Chicago IL, 60601

APPELLEE: Anita Alvarez, Cook County State's Attorney, James E Fitzgerald, Annette Collins, Mikah Soliunas, Assistant State's Attorneys, Richard J. Daley Center, Room 309, Chicago IL 60602

---

Add attorneys for third-party appellants and/or appellees.