NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 200122-U

NO. 4-20-0122

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 6, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Champaign County |
| FALANZO M. HIXSON, | ) | No. 99CF1850 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey B. Ford, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Defendant, a juvenile at the time of the offense, failed to prove the sentencing court applied inappropriate sentencing factors before imposing a 35-year sentence for first degree murder.

(2) Defendant's 35-year sentence is not excessive.

(3) Defendant failed to prove the truth-in-sentencing statute is unconstitutional as applied to him.

¶ 2    In April 2000, a jury found defendant, Falanzo M. Hixson (born November 28, 1981), guilty of the November 12, 1999, first degree murder of Jerry Brinegar (720 ILCS 5/9-1(a)(1), (2) (West 1998)). At that time, defendant was sentenced to 55 years' imprisonment. As a result of proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)), defendant was resentenced in January 2020 to 35 years' imprisonment. Defendant appeals his 35-year sentence, arguing (1) his sentence is "unconstitutionally harsh" as the

sentencing court failed to correctly apply the juvenile-sentencing factors, (2) the court abused its discretion in sentencing him to 35 years, and (3) the truth-in-sentencing statute is unconstitutional as applied to him as it denies him credit against his sentence and the opportunity to show rehabilitation. We affirm.

¶ 3                              I. BACKGROUND

¶ 4                       A. Defendant's Trial Proceedings

¶ 5         Defendant was charged with five counts of first degree murder and one count of felony murder for the death of Brinegar. Evidence at trial established police responded to a traffic accident involving a station wagon that crashed into a parked van. Brinegar, who had been driving the station wagon, had been shot twice. One shot went through his arm and pierced his heart. Brinegar was pronounced dead shortly after arriving at the hospital.

¶ 6         The trial evidence included testimony of a detective who investigated the case, David Griffet, and a witness who was present at the time of the shooting, Juan Carter. Detective Griffet testified he contacted an informant, Andre Gordon, who lived in the neighborhood where the shooting occurred. Gordon provided Detective Griffet with the murder weapon and identified "Falanzo" as the murderer. Detective Griffet questioned defendant the day after the shooting. Defendant denied knowing Brinegar and denied having touched a vehicle like Brinegar's vehicle.

¶ 7         Juan Carter, who had known defendant since the eighth grade, identified him as the shooter. The night of the shooting, near 9 p.m., defendant and Carter were walking when a dark blue or gray vehicle approached. Defendant told Carter the driver was "money," meaning a potential crack cocaine customer. Defendant approached the vehicle; Carter stayed 10 to 12 feet behind. Carter observed defendant physically "tussling over" Brinegar's wallet with Brinegar.

Defendant pulled a gun from his own coat pocket and fired two or three shots.

¶ 8        Gordon testified, on the night of November 12, 1999, defendant told him he had just shot a white man he did not know. Defendant told Gordon a white man and another person were "shooting at him." Defendant stated, "he got one of them b***." Later, defendant said he shot the "white guy" by mistake.

¶ 9        Charles Edwards, who had known defendant approximately eight months before the shooting, testified defendant knocked on a window at Edwards's house. Defendant told Edwards he shot "some white dude" in a car defendant mistakenly believed contained rival gang members with whom defendant had "got[ten] into it" earlier that day.

¶ 10        Defendant's fingerprint was found on the passenger-side windshield of Brinegar's car. Shell casings were found in the vehicle that matched the weapon Detective Griffet obtained from Gordon, the same weapon Carter identified as belonging to defendant.

¶ 11        The jury found defendant guilty of first degree murder but acquitted him of felony murder.

¶ 12                                B. Initial Sentencing

¶ 13        Defendant's sentencing hearing occurred in July 2000. At the beginning of the hearing, the trial court noted it had reviewed the May 2000 presentence investigation report (PSI). According to the PSI, defendant, at age 13, was convicted in September 1995 of unlawful possession of a controlled substance and sentenced to the Illinois Department of Corrections, Juvenile Division (JDOC). Defendant was not paroled until July 1998. In September 1998, defendant returned to the JDOC for a parole violation on another offense of unlawful possession of a controlled substance. The PSI indicates other technical parole violations, including the failure to comply with parole programs and being absent without official leave. In May 1999,

defendant was paroled again from the JDOC.

¶ 14        At the sentencing hearing, six witnesses testified for the State. These witnesses established charges were pending in Chicago against defendant for two controlled purchases of marijuana in August and September 1999.

¶ 15        Defendant called two witnesses to testify on his behalf: his great aunt, Elnora Fisher, and an intern from the Champaign Public Defender's Office, Miriam Sierig. Fisher testified she had not observed defendant act violently toward others. Defendant "got along well" with his siblings and had good relationships with his elders. Fisher would never have expected defendant would murder someone. Fisher called defendant "an outstanding *** kid" and "loving child." Sierig testified regarding conversations she had with defendant's father and stepmother. Sierig had expected both to attend the sentencing hearing. Defendant's father, Tyrone Hixson, told Sierig that defendant was very loving toward defendant's son. Tyrone was shocked his son was convicted of murder; he believed that to be out of character for him. Defendant's stepmother, Theresa Hixson, had known defendant for three years. Theresa called defendant very humble. Theresa had not seen defendant become enraged or throw a fit; he was friendly and calm.

¶ 16        During argument, the State highlighted defendant's history as a delinquent. The State further emphasized, while the above-mentioned charges were pending in Chicago, defendant removed his home-monitoring ankle bracelet and moved to Champaign. The State further emphasized defendant had been a gang member and urged the court to sentence defendant near the maximum of 60 years.

¶ 17        Defense counsel, in contrast, maintained mitigation evidence existed. According to counsel, the circumstances of the offense showed defendant was likely provoked before

shooting Brinegar. Counsel further argued a long prison term would be an excessive hardship on defendant's son and his family. Counsel highlighted the evidence showing defendant struggled with drug and alcohol problems and suffered from suicidal thoughts, depression, and anger.

¶ 18    The trial court sentenced defendant to 55 years' imprisonment.

¶ 19    C. Defendant's Direct Appeal and Postconviction Proceedings

¶ 20    Defendant pursued a direct appeal of his conviction and sentence. This court affirmed both. We found, in part, defendant's argument his sentence was excessive was barred by a procedural default.

¶ 21    The postconviction proceedings that led to defendant's resentencing and this appeal began with a successive postconviction petition filed in July 2016, in which defendant asserted his 55-year sentence was a *de facto* life sentence that violated the eighth amendment's prohibition against cruel and unusual punishment. See U.S. Const., amend. XIII. That September, the trial court summarily dismissed the petition. In June 2019, this court reversed that dismissal and remanded for resentencing. See *People v. Hixson*, 2019 IL App (4th) 160768-U, ¶¶ 46-47.

¶ 22    D. Sentencing on Remand

¶ 23    Defendant's sentencing hearing on remand was held in January 2020. At the hearing, evidence of defendant's confirmed disciplinary record was admitted. Defendant was found guilty of 39 infractions for incidents between March 2001 and August 2014. These infractions included fighting in May 2002, possessing dangerous contraband in May 2004, theft, trafficking, and multiple incidents of disobeying a direct order, including one in August 2014.

¶ 24    Michael Magana, deputy commander of intelligence for the northern region of the Illinois Department of Corrections (DOC), testified regarding some of the incidents listed above.

In addition, Magana testified defendant indicated around 2007 he was no longer involved in gang activity. The following information regarding defendant's conduct was obtained by Magana from DOC records. In 2005, there was a "Honey Bun" incident in which defendant refused three direct orders to comply. In February 2013, approximately 33 pages of "street gang literature" was found among defendant's property. Also in February 2013, defendant was found in possession of unauthorized prescription medication. A shakedown report describes an incident in January 2019 in which unauthorized items were found on defendant. Among the items recovered was an inmate identification card belonging to another inmate. Defendant was also found in possession of a photo book containing gang-related material.

¶ 25     Defendant also testified. According to defendant, he was born in Chicago, Illinois, to Gwendolyn and Tyrone Bates. Gwendolyn was an alcoholic and Tyrone was a drug addict. Defendant had five siblings. Defendant believed his mother was 14 years old when his oldest sibling was born. Their house "was always the party house." When defendant was approximately two to three years old, his parents separated. After the separation, defendant lived with "[v]arious people." Along with his siblings, he and his mother lived in a two-bedroom apartment. Between the date of the separation and 1992, defendant's mother had three live-in boyfriends. Defendant did not have consistent access to electricity or food at home. During this time, he was disciplined with "whoopings" with "whatever [was] around," such as a switch, extension cord, or belt. The discipline was issued by defendant's mother and grandmother. The grandmother lived in the same apartment building.

¶ 26     In 1992, when he was 11 years old, defendant was sent to live in New Jersey. The move was triggered by the crowd defendant began "hanging with" after he began selling drugs. Defendant explained a drive-by shooting occurred in the neighborhood while defendant was

outside. Defendant's mother thought defendant was the intended target, so he was sent to stay with his cousin. Defendant remained in New Jersey until January 1994.

¶ 27 Defendant testified about his relationship with his father. During defendant's "younger years," his father took him everywhere he went. Tyrone sold drugs and was "big in the streets." Starting around age seven, defendant witnessed Tyrone sell drugs. Tyrone even bagged drugs. Tyrone had an extensive criminal history, which prevented him from visiting defendant in DOC. When defendant was in JDOC, Tyrone "was in and out" of prison.

¶ 28 Defendant stated he began selling drugs when he was 9 or 10 years old. He did so as they never had a lot of money. Defendant recalled his mother used to get assistance from the government. She "was living from check to check," and it was not enough to get by. Defendant recalled hearing his grandmother, who owned the apartment building they lived in, tell his mother she would have to find somewhere else to live as the mother rarely paid rent. Defendant remembered hearing his mother crying.

¶ 29 Defendant believed the highest grade in traditional school he completed was fifth grade. While in JDOC, he earned his eighth-grade diploma. According to defendant, as of around October 1994, the family moved to Champaign, Illinois.

¶ 30 Defendant testified he had been sober for 20 years. While in DOC, defendant obtained substance-abuse counseling. He completed substance-abuse and dual-diagnosis classes. Defendant could not remember why he did not complete substance-abuse counseling when he was paroled in 1999. At that time, he "chose the streets."

¶ 31 Defendant explained a few of the disciplinary orders. Regarding the "Honey Bun" incident, defendant stated he was sitting in his cell and the commissary line was passing by. Someone threw the Honey Buns into his cell. An officer told defendant that was contraband and

to give them up. Defendant responded it was not, it was commissary. The officer then said it was trafficking and trading and ordered him to give them up. Defendant denied it was trading as he was sitting in his cell. The officer repeated to give them up or be sent to segregation. Defendant was sent to segregation.

¶ 32　　　　Defendant reported the "dangerous contraband" determination involved a "homemade stinger" in his possession. Defendant explained the commissary included "a lot of cooking food" that required hot water, such as rice, beans, and chili. Defendant created the stinger using paper clips and an extension cord to warm up water and cook food. Defendant stated he had not, during his time in DOC, physically struck or injured another inmate. Regarding the 33 pieces of gang literature, defendant stated he was unaware of books that were on the banned list, as they came to his possession while he was in prison. These included *48 Laws of Power*, which had "basically, 33 pieces of paper." Defendant believed it was deemed gang-related as it was a "book to deceive, manipulate, and stuff like that." The photo book contained photos from his sister's funeral. Defendant's sister was murdered in 2016. As the funeral was out of state, defendant was unable to attend. Someone put together a book with photos of her life and sent the book to defendant. Some of the photos contained gang-related material. Defendant accepted the book, as he believed the photo book had been vetted when he had to sign for it. Defendant was not in possession of those materials due to any intent to join a gang or communicate with gang members.

¶ 33　　　　Regarding the possession of another inmate's identification, defendant explained the identification card belonged to his neighbor, Duel Thomas. Defendant worked in the school building as a tutor. Thomas had asked him to make copies of a grievance while defendant was there. Defendant testified he asked the sergeant if he could make copies. The sergeant denied his

- 8 -

request unless he had Thomas's identification and a money voucher. The sergeant took the voucher and made a copy of the grievance to take to Thomas. As defendant left the building, "Internal Affairs was out there waiting." An abuse-of-privilege charge for that conduct was deleted but the remaining charges stayed. The sergeant denied telling defendant he could bring the identification to make a copy.

¶ 34　　　　While in DOC, defendant obtained his general equivalency diploma (GED). He counseled others regarding the importance of education. Defendant had tutored others over 15 months and 10 inmates had obtained their GEDs while under his tutelage. Defendant participated in two 5K runs for domestic violence. Defendant began taking classes through Benedictine University and eventually DePaul University. Defendant acknowledged his sister's death prompted a change in his view on life. His sister had spent three years in an Indiana prison. When she was released, "she was like a totally different person," as she had matured. His sister encouraged him "to be a better man." The person who killed his sister was 14 years old. Defendant initially hated him but said the following: "I'm quite sure down the road, he'll see his mistakes and better [himself,] too, [and] so I forgave him." Defendant admitted killing Brinegar. Defendant acknowledged, "[t]hat decision messed my life up."

¶ 35　　　　Defendant presented multiple exhibits on his behalf. One such exhibit, dated August 30, 2018, established defendant was admitted to the Northwestern Prison Education Program through Northwestern University. Another was a letter from Mary Pattillo, a professor of Sociology and African American Studies at Northwestern. Pattillo wrote defendant stood out in the 22-student course "for his always positive attitude, incredible helpfulness, and commitment to academic excellence." Pattillo opined, if there were a title of teaching assistant at DOC, defendant would have it. Defendant was critical in helping receive authorization to show a

documentary in class, which permitted her to show the same material to other students. She further opined he was "an eager and talented student" who received a perfect A on his first paper. Pattillo explained he faltered on another assignment when he wrote a paper on juveniles being tried as adults, which was not the assigned topic. However, he redeemed himself in the final paper. In the last assignment, defendant was to explain how social contexts and structural factors affect one's actions. Defendant "wrote about how his family's poverty made making money a priority and about how the hypermasculine aggressive culture in his neighborhood made violence a prized option." Pattillo concluded this assignment showed "the distance [defendant] has traveled since his youth and his ability to analyze now how he became who he was."

¶ 36　　　　In another exhibit, an assistant professor at Benedictine University, Cesraéa L. Rumpf, Ph.D., wrote defendant was a student in his "Inside-Out Transformative Justice" college course from January through May 2018. Dr. Rumpf wrote, as defendant's college professor, he had a sense of defendant's "character, his cognitive abilities, his social skills, and the person he is today." Dr. Rumpf was confident defendant would fit in on campus with students who filled the traditional classrooms, as "they could learn a great deal from his perseverance, strong work ethic, and commitment to continuously improving himself."

¶ 37　　　　In allocution, defendant apologized to the Brinegar family, his own family, and the courts. Defendant stated he wanted to help his mother raise his murdered sister's children. He asked the sentencing court to grant him that opportunity and give him a sentence of 20 years.

¶ 38　　　　Before imposing the 35-year sentence, the sentencing court reviewed the evolving juvenile-sentence case law since *Miller v. Alabama*, 567 U.S. 460 (2012). The court recognized, for sentencing purposes, children were constitutionally different from adults. The court noted children's lack of maturity and their underdeveloped sense of responsibility, which leads to

recklessness, impulsivity, and heedless risk-taking. The court observed children were more vulnerable to negative influences and pressure from family and peers; they also had limited control over their environment and lacked the ability to extricate themselves from "horrific crime-producing settings." The court highlighted the character of children was less fixed and less likely to be evidence of irretrievable depravity. The court summarized the initial sentencing hearing and sentence. In so doing, the court noted at that hearing the initial sentencing court found "[t]he evidence does not disclose whether this murder was motivated by sport or by business" and "[t]here is no discernable reason whatsoever in the evidence for [defendant] to have killed Jerry Brinegar." The court then stated the following:

"This Court has no qualms with what was ordered back in 1999 from the evidence presented at that time. But, of course, we all know, as has been previously stated, the law has changed and evolved. *** [C]hildren have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. ***

Basically, the only evidence we have as to [defendant's] childhood environment was what was provided today. Very little was provided back in 1999, as was noted by the sentencing court at that time. There was no showing at that time that anything in the environment in Chicago and once the Defendant came down to Champaign County was anything to do with the environment. He had total control of his environment, where he would go and what he would do. We know now a little bit more about his upbringing,

but he still, when he came down in late 1999, had total control of everything that he was involved in and everything he was doing.

* * *

We know from all the testimony previously and today that, although there may have been dysfunction in his family as he was growing up, there was none of that pressure on him that they're talking about here in the *Miller* case. The Defendant at trial testified he never had a job. He supported himself in October and November of 1999 by selling drugs. And it's supported himself is what the testimony was, not supporting anybody else.

We have a male juvenile, although not considered a juvenile at the time but now considered a juvenile, who was 17 years[,] 11[-]and[-]a[-]half months of age at the time of the murder. There's no showing of anything we have that he was immature at the time. Might he have been impetuous? Probably.

He was given the opportunity to get treatment, counseling, and education. It's been argued that he only has one juvenile crime, but the thing about it is is he kept getting released, kept committing more crimes, and kept going back to the [JDOC]. He was on parole. He had the chance and the opportunity to get treatment, substance[-]abuse treatment, continue his education. He decided not to do that. Every time he was released from the [JDOC], he ended up getting caught committing more crimes.

There are numerous people in the criminal[-]justice system who decide not to get treatment and to further their education. Here, [defendant] decided not to do that.

All the evidence presented, except for the sentence in the PSI, showed Defendant's family was supportive, although we have heard testimony today that his mother and grandmother were alcoholics.

There's no showing and it's not disputed that the Defendant shot and killed Jerry Brinegar all by himself. There's no showing that he was unable to cooperate, unable—with his attorney, unable to deal with the police or prosecutors. *** The transcripts from 1999 do not show any remorse, although today we have testimony and his right of allocution that there is remorse.

The evidence has shown, especially today, that the Defendant back in 1999 was a drug dealer. This is what he's been doing since at least 13, if not earlier. Every time he was released from incarceration, he was dealing drugs. By 1999, he had a gun. By October of 1999. Was he immune from the fact that the drug trade could be deadly? No. In fact, there's evidence today that that's why he moved to New Jersey, because there was a threat out on his life. Okay. So, what do drug dealers do? They arm themselves. That's part of the business. When he met with the victim here, Mr. Brinegar, he had a loaded handgun with him,

which means it was part of his business and he had no qualms about using it. You don't bring a gun with you—a loaded gun—for any other reason.

There's no evidence that this Defendant needed money to support anybody else, much less his child. Basically, this is what he did and this is how he got his own money at the time.

His upbringing was bad. There were economic stressors[;] there was physical abuse to him. Again, as I stated, he had an opportunity for counseling, but as he noted and he's testified to, he chose the street. There is no—again, there's no showing that there was any gang pressure or anything else on the Defendant. It's clear that *** this Defendant was exposed to the drug trade as an—at an early age from his father and he learned that it is a way of obtaining money.

The disciplinary documentation and evidence provided today is really a type of a double-edged sword. We have in the mitigation a showing of all the changes and all the things that [defendant] has done, as to his GED in 2007, the Inside-Out Prison Exchange in 2018 and 2019, creative writing in 2017, domestic[-]violence prevention [in] December 2017[,] violence prevention [in] October 2016[, and] Victory Over Self in July 2015.

But what's interesting is he's got 15 years in the penitentiary before any of this starts. Now, we do have the

testimony that—of his sister's sad incident in 2016. But there were also other factors going on at that time, and the Court cannot ignore the fact that the cases that the Court has gone through showing the changes by the Supreme Court of the United States and the Illinois Supreme Court started—started—the earliest one is 2010. *Miller* is 2012. All of a sudden, the Illinois Supreme Court jumps in with retroactivity back around 2016, and this Defendant now gets interested in going to classes and doing the things that he's testified to and shown in the documents in mitigation. And this Court, having done almost every post-conviction petition and 2-1401 petition throughout the entire 1990's and a number of them since 2000, knows that as soon as these cases hit the [DOC], everybody starts filing [postconviction] petitions and 2-1401's. [Defendant] could have in one train of thought decided I've got a shot here to get out. I need to show that I'm rehabilitated. So, there's a lot of things going on here.

Although his efforts are noted, his efforts are shown that he was attempting to improve himself, which is not a bad thing, but we're talking about—and as has been argued—rehabilitative potential. Potential is one thing. Doing it is another. [Defendant] started just a few years ago to show he was making changes. Prior to that, his history in the [DOC] was not one to write home about. Yes, there's very little violence. He denied being involved with

gangs. But the Honey Buns isn't something that we can just sit here and laugh about because it's Honey Buns. There are rules in the [DOC]. Items such as that, as anyone knows, can be used for barter or for anything else. There are rules and discipline needs to be maintained in there. And by that time, [defendant] had been there long enough to know that the rules have to be followed.

So, does he have rehabilitative potential? Yes. He has shown from everything else here that he has rehabilitative potential. But starting to change is still potential. ***

*** 

The Court has considered the *Miller* factors. The question is is there any of the other. Is there the irretrievable depravity, permanent incorrigibility, or irreparable corruption? The Court doesn't find irretrievable depravity here at all. The Court does not find irreparable corruption. ***.

Is the Defendant at this point incapable of being reformed? No. There has been showing of changes by him and the attempt to change. The letters that have been received in mitigation and especially in the Inside-Out Prison Exchange show[ ] that this Defendant is making the attempts to change and do the things that are necessary to change.

As to his sentence, though, will—is this Court considering more than 40 years? No. As everybody understands, the Court

doesn't believe that *People v. Buffer*, 2019 IL 122327, applies here, but the Court also from the recommendations and the evidence presented as to the Defendant's attempts to habilitate himself show that the 40[-]year ceiling that people are now starting to talk about are not necessary.

However, as the Court has noted, the Defendant is starting to change. He is starting to make changes. After 15 years in the penitentiary is when he really started to do those things. Basically, when you're talking about rehabilitation, it's basically a crapshoot. The Court is supposed to sit here and make a decision into the future as to what is in the heart and mind of a person and make that determination.

From the legislation ***, what we're seeing is there's a chance at parole. And who is the best to make the determination whether that defendant has truly either habilitated himself or rehabilitated himself? And that's the people who see him all the time. We're asking this Court to look into the future, which it can't. The Defendant has a good start, but can I say that his sentence should now be[ ] served because he has a good start? No.

I think the Defendant does need to have more time in the penitentiary, more time to prove that this is a serious matter. He did murder somebody for no reason whatsoever, brought a gun with him when he knew he was dealing drugs. He continuously

kept himself out of any rehabilitative situation at that time. Saying that you're done, at this point, is not appropriate. And since the Defendant will continue now to have the ability to attempt at parole at least twice, the Court finds that an appropriate sentence is the sentence recommended by the State in this matter."

¶ 39　　　　This appeal followed.

¶ 40　　　　　　　　　　　　II. ANALYSIS

¶ 41　　　　　　　　　　　　　A. Sentence

¶ 42　　　　Defendant first argues this court must reduce his 35-year sentence or remand for resentencing as the sentencing court failed to properly consider the statutory juvenile-sentencing factors (730 ILCS 5/5-4.5-105(a) (West 2020)), resulting in an unconstitutionally harsh sentence for a crime he committed when he was 17 years old. In support, defendant emphasizes the court's determination he did not show signs of immaturity when the case law establishes juveniles are by nature immature. Defendant contends more weight should have been given to his impetuosity, the peer pressure imposed by his gang involvement, and the evidence of his family dysfunction. Defendant asserts both more weight should have been afforded to his rehabilitative potential and his juvenile history was not so significant as to justify the 35-year sentence.

¶ 43　　　　The parties disagree as to the standard of review to be applied. Defendant asserts a combination of standards. Defendant begins by observing the Illinois Supreme Court has not yet set forth an applicable standard of review for consideration of whether a sentencing court correctly applied the statutory mitigating factors of section 5-4.5-105(a). With this point, the State agrees. Defendant, however, seemingly urges this court to apply the *de novo* standard, as he

- 18 -

points to the *de novo* standard as the one to be applied on review of whether a sentencing court improperly considered a factor in aggravation or mitigation (see *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 65, 129 N.E. 3d 755), and in consideration of whether a sentencing court correctly applied the law to the facts (see generally *People v. Luedemann*, 222 Ill. 2d 530, 542, 857 N.E.2d 187, 195 (2006)). Defendant acknowledges the abuse-of-discretion standard is applied to decisions based on weighing mitigating and aggravating factors. See *People v. Solis*, 2019 IL App (4th) 170084, ¶ 23, 138 N.E.3d 247. The State emphasizes defendant's appeal is essentially a challenge to the length of his sentence, a claim the sentence is excessive, to which the abuse-of-discretion standard applies. The State contends defendant is simply challenging the sentencing court's application of the statutory factors in fashioning his sentence.

¶ 44　　　　We agree with the State's position defendant is essentially arguing his sentence is excessive. See *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 26 (citing *People v. Johnson*, 2019 IL 122956, ¶ 39, 129 N.E.3d 1239). However, defendant's arguments are, at times, directed toward the applicability of a sentencing factor. To the extent defendant's arguments raise a contention of statutory construction, we will review such contentions under the *de novo* standard. See *id.* We note, on review, both the strong presumption a sentencing court used proper legal analysis in fashioning a sentence and the mandate we consider the record in its entirety rather than focusing on a few isolated statements. *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 55, 141 N.E.3d 320. The defendant bears the burden of affirmatively establishing his sentence was based on an improper factor. *Id.*

¶ 45　　　　Section 5-4.5-105(a) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-4.5-105(a) (West 2020)) provides mandatory sentencing factors to be considered before the imposition of sentences for offenses committed when the offender was under the age

of 18. In fashioning sentences, courts are to consider the following additional factors in mitigation:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

> (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

> (4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

> (5) the circumstances of the offense;

> (6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

> (7) whether the person was able to meaningfully participate in his or her defense;

> (8) the person's prior juvenile or criminal history; and

> (9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a

statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.* § 5-4.5-105(a)(1)-(9).

¶ 46                             1. *Impetuosity and Maturity*

¶ 47        Defendant's first allegation of the consideration of an improper sentencing factor centers on subsection 5-4.5-105(a)(1) (*id.* § 5-4.5-105(a)(1)), in which he points to the sentencing court's statement, "[t]here's no showing of anything we have that he was immature at the time." Defendant contends this statement implies maturity is to be assumed of all individuals and a defendant must show he was otherwise immature, while the case law plainly establishes juveniles are by nature "immature."

¶ 48        Considering the sentencing court's comments in their entirety, we find defendant has not met his burden of showing error in the consideration of defendant's maturity. See *Musgrave*, 2019 IL App (4th) 170106, ¶ 55 (stating defendant bears the burden of affirmatively proving his sentence was based on an improper factor). In its analysis before imposing the sentence, the court addressed the history of juvenile sentencing. In doing so, the court discussed *Miller*, in which the Supreme Court listed many of the attendant factors of youth, including "immaturity, recklessness, and impetuosity." *Miller*, 567 U.S. at 472. The court expressly summarized ways in which juveniles differ from adults, including the fact children lack maturity. The court further observed defendant was just shy of the 18-year-old statutory cutoff. Given the comments in their entirety, we cannot find the court treated defendant's maturity as on as the same level as an adult rather than finding defendant was no less mature than others his age.

¶ 49        Regarding this same subsection, defendant argues the sentencing court failed to consider properly how his "possible" impetuosity could have influenced defendant to commit the offense. This argument is a question of weight and not the propriety of a mitigating factor. It is

"an improper exercise of the powers of a reviewing court" to reweigh sentencing factors. *People v. Alexander*, 239 Ill. 2d 205, 214-15, 940 N.E.2d 1062, 1067 (2010). Only if we find the court abused its discretion in sentencing may we make such an undertaking. See *id.* at 212 ("A reviewing court may not alter a defendant's sentence absent an abuse of discretion by the trial court."). Below, we find no abuse of discretion in defendant's 35-year sentence. It is therefore improper for this court to consider the weight afforded by the court to this factor.

¶ 50          2. *Peer Pressure, Familial Pressure, and Negative Influences*

¶ 51          Defendant next argues the sentencing court, when considering the applicability of section 5-4.5-105(a)(2), "whether the person was subjected to outside pressure, including peer pressure, familial pressure or negative influences" (730 ILCS 5/5-4.5-105(a)(2) (West 2020)), ignored the pressure gangs and families place on juveniles. Defendant highlights the evidence shows he was involved in gangs and told at least one witness he believed rival gang members shot at him on the day of the murder. Defendant further emphasizes the pressures on him from family, including a father who introduced him to the drug trade when he was nine years old and a mother who cried when she had no money to pay rent. Defendant contends the court erred by failing to find such pressures influenced him.

¶ 52          This argument is not based on an improper factor but on the weight afforded to that factor. While we may or may not disagree with the weight afforded to the factor, we lack authority to reweigh the evidence and find it improper to do so here. See *Alexander*, 239 Ill. 2d at 212.

¶ 53          3. *Family Background and History of Abuse*

¶ 54          Defendant next argues the sentencing court's "application of the facts was manifestly erroneous" to the consideration of his family background and history of abuse as

required by section 5-4.5-105(a)(3) (730 ILCS 5/5-4.5-105(a)(3) (West 2020)). Defendant points to the court's observation defendant's family had "dysfunction," but then it found defendant's "family was supportive." Defendant emphasizes no mention was made of his father's being a career criminal addicted to drugs.

¶ 55    Again, despite his characterization of this argument as an improper application of facts to the law, defendant is essentially asking this court to reweigh the evidence at sentencing. The sentencing court directly addressed defendant's upbringing and the history of abuse. It is not proper for us to reweigh this evidence absent a finding the sentence is an abuse of discretion, which we did not find in this case. See *Alexander*, 239 Ill. 2d at 212.

¶ 56                          4. *Potential for Rehabilitation*

¶ 57    Defendant next asserts the sentencing court failed to account for his strong potential for rehabilitation. According to defendant, the court gave too much weight to defendant's disciplinary record and improperly implied defendant's motivation to rehabilitate was to obtain a reduction in his sentence.

¶ 58    We disagree. The sentencing court's comments indicate it gave weight to defendant's efforts. While the court observed the timing of his efforts coincided with the evolution of sentencing law favorable to juveniles, the court observed, "[t]here has been showing of changes by him and the attempt to change." The court further emphasized the letters from college professors, in which one professor opined defendant exhibited, among other things, "perseverance, strong work ethic, and commitment to continuously improving himself." The court was also aware it could consider sentencing defendant to more than 40 years' imprisonment but found such a sentence inappropriate, reducing defendant's 55-year sentence to 35 years. The court considered this factor in its weighing of the evidence. Any attempt to

reweigh this factor against the "incidents on [defendant's] disciplinary card" is inappropriate.

¶ 59        Defendant further argues the sentencing court erroneously placed the responsibility of determining defendant's rehabilitative potential on the parole system when it observed, under section 5-4.5-110 (730 ILCS 5-4.5-110 (West 2020)), defendant has a chance at parole. Defendant points to the following from his sentencing in support:

> "The Court is supposed to sit here and make a decision into the future as to what is in the heart and mind of a person and make that determination.
>
> From the legislation ***, what we're seeing is there's a chance at parole. And who is the best to make the determination whether that defendant has truly either habilitated himself or rehabilitated himself? And that's the people who see him all the time. We're asking this Court to look into the future, which it can't. The Defendant has a good start, but can I say that his sentence should now be[ ] served because he has a good start? No."

Defendant argues the court erred in ceding the responsibility to consider rehabilitative potential.

¶ 60        We disagree. The sentencing court did not cede its responsibility. The record shows defendant's rehabilitative potential was considered and weighed against the seriousness of the offense. The sentences directly after the above excerpted text show the following:

> "I think the Defendant does need to have more time in the penitentiary, more time to prove that this is a serious matter. He did murder somebody for no reason whatsoever, brought a gun

with him when he knew he was dealing drugs. He continuously kept himself out of any rehabilitative situation at that time. Saying that you're done, at this point, is not appropriate."

¶ 61                    5. *Defendant's Participation and Role in the Offense*

¶ 62        Defendant next contends the sentencing court failed to consider there was no level of planning from defendant before the offense; rather, the offense was entirely impulsive. Defendant, while acknowledging the brutal nature of the offense, argued the court suggested he premeditated Brinegar's murder: "So, what do drug dealers do? They arm themselves. That's part of the business. When he met with the victim here, Mr. Brinegar, he had a loaded handgun with him, which means it was part of his business and he had no qualms about using it. You don't bring a gun with you—a loaded gun—for any other reason."

¶ 63        We disagree with defendant's interpretation of the sentencing court's statement. As a whole, the court's analysis shows it knew the facts of the case. There is no suggestion the act of shooting Brinegar was premeditated. The act of owning a gun and taking it to a potential drug deal, however, was. That is what the court said. Defendant has not shown error.

¶ 64                              6. *Excessiveness*

¶ 65        Defendant maintains this court should find his sentence excessive. Defendant emphasizes the juvenile-sentencing factors, when considered against the aggravating factors of section 5-5-3.2(a)(7) (730 ILCS 5/5-5-3.2(a)(7) (West 2020)), do not justify the 35-year sentence, which is five years below a *de facto* life sentence for juveniles. See *Buffer*, 2019 IL 122327, ¶¶ 36-42 (finding a sentence exceeding 40 years to be a *de facto* life sentence for juveniles). Defendant acknowledges the murder of Brinegar was "horrible and indefensible" but maintains he "was not a cold and calculated killer, but a teenager, caught up in an impulsive act

of violence."

¶ 66    Under the Illinois Constitution, sentences are to be set "according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. Sentences for all offenders, including juveniles, are to be determined after consideration of statutory mitigating and aggravating factors. See 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2020). The aggravating factors defendant addresses in this case are defendant's criminal history (*id.* § 5-5-3.2(a)(3)) and the need for deterrence (*id.* § 5-5-3.2(a)(7)). The factors of section 5-4.5-105(a) (*id.* § 5-4.5-105(a)), listed above, are additional mitigating factors to be considered in the sentencing of offenders under the age of 18. In sentencing juveniles, sentencing courts need not articulate each factor considered. *Merriweather*, 2022 IL App (4th) 210498, ¶ 31.

¶ 67    We are mindful of the great deference to be afforded to sentencing courts, which observe witness credibility and demeanor and sit in a better position to determine a proper sentence based on the particular circumstances of the case. See *id.* (citing *People v. Price*, 2011 IL App (4th) 100311, ¶ 36, 958 N.E.2d 341). In challenges asserting a sentence is excessive, we will find an abuse of discretion only when that sentence is greatly at variance with the law's spirit and purpose or when it is manifestly disproportionate to the crime's nature. *Merriweather*, 2022 IL App (4th) 210498, ¶ 26 (citing *Johnson*, 2019 IL 122956, ¶ 39).

¶ 68    The applicable sentencing range for first degree murder in 1999 was 20 to 60 years' imprisonment or natural life imprisonment. 730 ILCS 5/5-8-1(a) (West 1998). Since defendant's resentencing, the evolving law of juvenile sentencing has been clarified to permit the imposition of sentences greater than 40 years "as long as the trial court considers the factors set forth in section 5-4.5-105(a) in exercising its discretion." *Merriweather*, 2022 IL App (4th)

210498, ¶ 32 (citing *Jones v. Mississippi*, 593 U.S. ---, ---, 141 S. Ct. 1307, 1314-15 (2021)). Thus, while defendant's 35-year sentence is 5 years under the *de facto* life sentence threshold of *Buffer*, it is much less than the maximum the sentencing court was statutorily authorized to impose.

¶ 69 We find no abuse of discretion in the 35-year sentence. The sentencing court considered defendant's youth at the time of the offense as well as the characteristics of youth codified in section 5-4.5-105(a) and determined a sentence greater than 40 years was not appropriate. The court acknowledged defendant's remorse, efforts toward rehabilitation, and tragic upbringing. However, the decision that these mitigating factors did not warrant a lesser sentence is not greatly at variance with the law's spirit and purpose or manifestly disproportionate to the crime's nature. See *Johnson*, 2019 IL 122956, ¶ 39 (defining the standard by which an abuse of sentencing discretion may be found). While admittedly attempting to sell drugs and steal a man's wallet, defendant committed murder, a very serious crime. Defendant shot an unarmed man. Defendant's sentence is not excessive.

¶ 70 Defendant's case law is distinguishable. For example, defendant relies on the First District Appellate Court's decision in *People v. Calhoun*, 404 Ill. App. 3d 362, 389, 935 N.E.2d 663, 678 (2010), to support his claim this court should reduce his sentence. *Calhoun*, however, does not support the proposition we may alter a sentence when the sentencing court has considered and weighed the mitigating factors, but only states such may be done "where a trial court has neglected its duty to consider the relevant mitigating factors." *Id.* Here, the record shows the sentencing court was well-versed in the evolving law on juvenile sentencing and considered the statutory mitigating factors for sentencing juvenile offenders.

¶ 71 B. As-Applied Challenge to the Truth-in-Sentencing Statute

¶ 72        Defendant last argues the truth-in-sentencing statute, section 3-6-3(a)(2)(i) of the Unified Code (730 ILCS 5/3-6-3(a)(2)(i) (West 2020)), as applied to him, violates the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11) and is, therefore, unconstitutional. Subsection 3-6-3(a)(2)(i) prohibits the application of good-conduct credit toward the sentences of those, like defendant, convicted of first degree murder. 730 ILCS 5/3-6-3(a)(2)(i) (West 2020). Defendant contends the application of this prohibition against him, a juvenile at the time of the offense, denies him the opportunity to demonstrate rehabilitation and, therefore, offends our community's evolving standards of moral decency. As such, defendant maintains, his sentence is unconstitutional.

¶ 73        When faced with a challenge to the constitutionality of a statute, we presume that statute is constitutional. *People v. Rhoades*, 2018 IL App (4th) 160457, ¶ 12, 115 N.E.3d 1238. The party asserting otherwise bears the heavy burden of rebutting that presumption. *Id.* To prevail on his as-applied challenge, defendant must show the statute is unconstitutional as applied to the facts and circumstances specific to him, the challenging party. *People v. Harris*, 2018 IL 121932, ¶ 38, 120 N.E.3d 900. As the constitutionality of a statute is a matter of law, our review is *de novo*. See *People v. Rizzo*, 2016 IL 118599, ¶ 23, 61 N.E.3d 92.

¶ 74        Defendant's arguments involve not only the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11), upon which his claim is based, but also on the eighth amendment to our federal constitution (U.S. Const., amend. XIII). According to the proportionate-penalties clause, sentences are to be set "according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. The eighth amendment, in contrast, bans "cruel and unusual punishments." U.S. Const., amend. VIII.

¶ 75          As defendant acknowledges, this court, in *People v. Pacheco*, 2013 IL App (4th) 110409, ¶ 60, 991 N.E.2d 896, rejected a claim like the one he asserts here. In *Pacheco*, the defendant, a juvenile serving a 30-year sentence for murder, challenged the same truth-in-sentencing statute as well as the automatic-transfer statute (705 ILCS 405/5-130(1)(a)(i) (West 2008)), which triggered the automatic trying of her as an adult. *Pacheco*, 2013 IL App (4th) 110409, ¶¶ 1, 47. This court first addressed the challenge to the automatic-transfer statute and found, as applied to the defendant, it does not violate the eighth amendment or the Illinois proportionate-penalties clause. *Id.* ¶ 55. In so holding, we first cited Illinois Supreme Court case law concluding the proportionate-penalties clause is "coextensive with the eighth amendment." *Id.* ¶ 54 (citing *In re Rodney H.*, 223 Ill. 2d 510, 518, 861 N.E.2d 623, 628 (2006)). We then found the automatic-transfer statute by itself imposed no punishment on the defendant and, therefore, did not violate the eighth amendment. *Id.* ¶ 55. We further rejected the defendant's attempts to argue "the automatic imposition of any adult sentence on a juvenile defendant as a result of the automatic transfer statute violates the eighth amendment and the proportionate[-]penalties clause." *Id.* ¶ 57. We found this argument, "taken to its logical extreme," would make any statute that imposes a juvenile to the same mandatory minimum sentence as an adult unconstitutional. *Id.* We reasoned the juvenile case law, including *Miller*, did not find the eighth amendment prohibits the same mandatory minimum sentence for juveniles and adults unless the mandatory minimum was life in prison without the possibility of parole or death. *Id.* ¶ 58. Because the defendant in *Pacheco* was not sentenced to natural life or death, we rejected defendant's argument. Regarding the *Pacheco* defendant's truth-in-sentencing argument, we adopted the same reasoning to find the truth-in-sentencing statute was not unconstitutional. *Id.* ¶ 60.

¶ 76    Since *Pacheco*, this court reached the same conclusion in *People v. White*, 2021 IL App (4th) 200108-U. In *White*, the juvenile defendant was convicted of murder and sentenced to 27 years' imprisonment. *Id.* ¶¶ 6-7. Defendant appealed the denial of his successive postconviction petition, in which he asserted the truth-in-sentencing statute was unconstitutional under the eighth amendment and the Illinois proportionate-penalties clause as applied to him. *Id.* ¶ 14. This court followed *Pacheco* and rejected defendant's claim. See *id.* ¶ 19 (citing *Pacheco*, 2013 IL App (4th) 110409, ¶ 60). We first found the eighth amendment did not prohibit his 27-year sentence because the sentence "does not deny him the opportunity to demonstrate his potential for rehabilitation." *Id.* ¶¶ 30. We then found, because the eighth-amendment-based claim fell, so did the claim under the proportionate-penalties clause as the two provisions are coextensive. *Id.* ¶ 31 (citing *People v. Patterson*, 2014 IL 115102, ¶ 106, 25 N.E.3d 526).

¶ 77    In a likely attempt to distinguish *Pacheco* and undermine *White*, both of which rejected the proportionate-penalties claim on the defendants' failures to show a violation of the eighth amendment, defendant limits his argument to the Illinois proportionate-penalties clause and cites a decision in which the Illinois Supreme Court found our state's proportionate-penalties clause affords broader protection than the eighth amendment. See *People v. Clemons*, 2012 IL 107821, ¶ 40, 968 N.E.2d 1046. In *Clemons*, the supreme court considered an argument based on the identical-elements test employed in the review of certain proportionality claims. See *id.* ¶ 1. In the analysis of the defendant's challenge to his sentence, the court concluded the Illinois proportionate-penalties clause is not coextensive with the eighth amendment: "What is clear is that the limitation on penalties set forth in the second clause of article I, section 11, which focuses on the objective of rehabilitation, went beyond the framer's understanding of the eighth amendment and is not synonymous with that provision." *Id.* ¶ 40.

¶ 78     The State counters by citing *Patterson*, which states the two provisions are coextensive. *Patterson*, 2014 IL 115102, ¶ 106. The *Patterson* court did not address *Clemons* or employ a similar analysis, but simply cited a 2006 decision for its conclusion. *Id*. (citing *Rodney H.*, 223 Ill. 2d at 518). As shown above, this court did not address *Clemons* in *Pacheco* or *White*, but relied on *Patterson* and its "co-extensive" language in rejecting proportionate-penalties-based claims. See *White*, 2021 IL 200108-U, ¶ 31; see also *Pacheco*, 2013 IL App (4th) 110409, ¶ 54 (citing *Rodney H.*, 223 Ill. 2d at 518).

¶ 79     Neither party delves into an analysis or argument showing why its position on the relationship of Illinois's proportionate-penalties clause to the eighth amendment is superior to the other. The discrepancy between *Clemons* and *Patterson may* be due to the different challenges that arise under the proportionate-penalties clause. Under this clause, a statute may be found unconstitutionally disproportionate in two circumstances: if "the penalty for a particular offense is too severe," or if the penalty "is harsher than the penalty for a different offense that contains identical elements." *People v. Sharpe*, 216 Ill. 2d 481, 521, 839 N.E.2d 492, 517 (2005). *Patterson* addresses a proportionality claim on the former (*Patterson*, 2014 IL 115102, ¶ 106), while *Clemons* involves a defendant's arguing the latter (see *Clemons*, 2012 IL 107821, ¶¶ 3-5). But see *Rodney H.*, 223 Ill. 2d at 513, 518 (stating, without analysis, the two provisions are coextensive in reviewing a claim involving "offenses with the same elements").

¶ 80     The question is an important one to the resolution of defendant's claim. If *Clemons* is correct, then we cannot simply rely on the conclusion in *Pacheco* and *White* that, because the truth-in-sentencing statute is, as applied to defendant, not a violation of the eighth amendment, it follows it is also not a violation of the Illinois proportionate-penalties clause. *Pacheco*, 2013 IL App (4th) 110409, ¶¶ 54, 55, 58, 60; *White*, 2021 IL App (4th) 200108-U,

- 31 -

¶ 31. We would then analyze the claim under traditional proportionate-penalties analysis.

¶ 81          This presents a problem for defendant, as he carries the burden of proving the truth-in-sentencing statute is unconstitutional as applied to him. See *Rhoades*, 2018 IL App (4th) 160457, ¶ 12. By not developing an argument why the more detailed analysis in *Clemons* prevails instead of the long-standing conclusion reiterated in the post-*Clemons* decision of *Patterson*, defendant has not convinced this court *Pacheco* should be overruled or its analysis ignored. *Pacheco*'s holding applies.

¶ 82          Defendant nevertheless argues this court should reconsider *Pacheco* "in light of the Illinois Supreme Court's strong statements supporting a day-for-day sentencing scheme to encourage the rehabilitation of juveniles." In support, defendant relies on language from *People v. Dorsey*, 2021 IL 123010, ¶ 57, 183 N.E.3d 715, in which the Court stated, "the above-mentioned principles establish that a statutory scheme providing for good-conduct credit can actually afford *greater* certainty and protection against arbitrariness than a discretionary parole system."(Emphasis in original.)

¶ 83          We are not convinced. *Dorsey* does not address the same arguments raised in *Pacheco*. The question before the *Dorsey* court was the effect "the availability of day-for-day, good-conduct credit has on the question of whether a *de facto* life sentence without the possibility of parole has been imposed." *Id.* ¶ 49. Because the *Dorsey* defendant was sentenced before the valid enactment of the truth-in-sentencing statute, the defendant, who had been sentenced to 76 years' imprisonment, was eligible for day-for-day credit and needed to serve only 38 years of that sentence. *Id.* ¶ 50. This, according to the supreme court, meant the "defendant was not sentenced to the functional equivalent of a life sentence without the possibility of parole in violation of *Buffer*'s more-than-40-years pronouncement." *Id.* In arguing

against the calculation of day-for-day, good-conduct credit in the determination of whether a *de facto* life sentence has been imposed, the defendant argued the trial court had no control over how good-conduct credit might be lost and good-conduct credit may be revoked without due process. *Id.* ¶ 55. In dismissing that argument, the supreme court compared the good-conduct system with that of the parole system. *Id.* ¶ 56. The court observed the United States Supreme Court had found "extending parole eligibility to juvenile offenders satisfies the eighth amendment and that a State may remedy a *Miller* violation by merely permitting the offender to be considered for parole without any resentencing." *Id.* (citing *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016)). The *Dorsey* court reasoned, if a system that permits an opportunity for parole passes constitutional muster, so, too, should a statutory scheme that allows for good-conduct credit, as good-conduct may provide broader protection than the parole system. See *id.* ¶¶ 56-57.

¶ 84        Not only does *Dorsey* not support defendant's argument, but also, with *Pacheco*, it establishes the truth-in-sentencing statute, as applied to defendant, survives constitutional scrutiny. *Dorsey* shows no violation of the eighth amendment occurs when a juvenile is sentenced to more than 40 years' imprisonment so long as a system of parole is available that would permit release before a *de facto* life sentence would be served. *See id.* (citing *Montgomery*, 577 U.S. at 212). It follows a lesser sentence of 35 years with a system of parole for that juvenile, as is available to defendant (see 730 ILCS 5/5-4.5-115(b) (West 2020)), survives eighth-amendment scrutiny. Under *Pacheco*, because the proportionate-penalties clause is coextensive with the eighth amendment and the eighth amendment permits the sentence imposed here, defendant has not established the statute, as applied to him, violates the Illinois proportionate-penalties clause. Defendant has not been denied the opportunity to show his

rehabilitation.

¶ 85                          C. Motions Taken With the Case

¶ 86        There are two pending motions taken with the case. The first is the State's motion to strike purported authorities. In this motion, the State objects to defendant's citation on appeal of articles not considered by the sentencing court. According to the State, it is improper to consider the court's exercise of discretion with materials not presented to that court. Defendant responds by emphasizing the case law holding such articles are properly considered when an issue is one for *de novo* review.

¶ 87        The second pending motion in this appeal is one filed by defendant in response to an order this court entered in *People v. Klein*, 2022 IL App (4th) 200599, 203 N.E.3d 961. In *Klein*, the defendant filed in his opening brief a scientific article for the proposition lengthy sentences will not deter drug use. *Id.* ¶ 47. The State moved to strike the authority, maintaining, in part, the article was not cited to the sentencing court. *Id.* ¶ 50. In response to this dispute, over a dissent, this court granted oral argument on the matter and directed the following for a list of cases, including this one: "To the extent the other cases listed [above] involve different materials or issues that are subject to the State's motion to strike, the parties at oral arguments should be prepared to identify and discuss those differences, as well as any different contentions regarding those different materials or issues." Defendant responds to this order by filing his objection to consideration of the oral argument in *Klein* in the resolution of this case.

¶ 88        We begin with the second motion, defendant's objection to our consideration of the oral argument in *Klein*, and deny the motion as moot. Since the filing of this motion, an opinion was issued in *Klein*. Thus, we need not consider the oral argument from *Klein* but will consider *Klein* itself.

¶ 89         As to the first motion, *Klein* speaks directly to the issue at hand. This court found, "it is impermissible for a reviewing court to take judicial notice of material that was not considered by the trial court when a defendant *** is challenging the trial court's exercise of discretion." *Id.* ¶ 58. The question here turns on whether the articles cited by defendant in this case were introduced in the challenging of the sentencing court's discretion.

¶ 90         The State moved to strike five authorities not presented to the sentencing court. The first two were cited by defendant in his opening brief to support his claim the court failed to give more than lip service to how the "transient characteristics of youth played a role in this case:" Elizabeth P. Shulman & Elizabeth Hoffman, *Reward-Based Risk Appraisal and Its Relation to Juvenile Versus Adult Crime*, 37 Law & Human Behavior 412, 413 (2013), and Sunita Bava & Susan F. Tapered, *Adolescent Brain Development and the Risk for Alcohol and Other Drug Problems*, Neuropsychology Rev. 20, 398, 403 (2010). Defendant cites these articles to show how adolescents are affected by peer influences to engage in dangerous activities and how drug use affects brain development and maturity. These articles do not go to the propriety of the consideration of a mitigating factor, which would require *de novo* review (see *Hibbler*, 2019 IL App (4th) 160987, ¶ 65), but to the weight afforded to such factor, the consideration of which turns on the question of whether the sentence is an abuse of discretion (see *Alexander*, 239 Ill. 2d 205, 212, 214-15). *Klein* prohibits consideration of these articles for the first time on appeal.

¶ 91         The same is true for the other three articles. Defendant cites two to support his contention the sentencing court ignored the immense pressure gangs place on juveniles: Dustin Albert, Jason Chein & Laurence Steinberg, *Peer Influences on Adolescent Decision Making*, Curr. Dir. Psychol. Sci. 2013 Apr; 22 (2) 114-120 (2014), and Jason Chein, *et al.*, *Peers Increase Adolescent Risk-Taking by Enhancing Activity in the Brain's Reward Circuitry*, 14

Developmental Science F1 (2011). The last article was cited to show a father's absence is a predictor of violence: Jennifer Schwartz*, The Effect of Father Absence and Father Alternatives on Female and Male Rates of Violence* (July 2004) https://www.ncjrs.gov/pdffiles1/nij/grants/206316.pdf (last visited May 15, 2023). These all go to the weight the court placed on the factors of peer and familial influence as well as family background. We have not considered these sources.

¶ 92                                    III. CONCLUSION

¶ 93            For the reasons stated, we affirm the sentencing court's judgment.

¶ 94            Affirmed.